Catherine D. TANCREDI, and Louis D. Tancredi, Sr., Individually and as Co–Administrators for the Estate of Louis D. Tancredi, Jr., Deceased, Plaintiffs,

v.

DIVE MAKAI CHARTERS, Tom Shockley, Lisa Choquette, Gary Simons and Rich Westphal, Defendants.

Civ. No. 89–00873 BMK.

United States District Court, D. Hawaii.

May 28, 1993.

---

Michael D. Wilson, Judith Ann Pavey, Cindy S. Inouye, Honolulu, HI, for plaintiff.

John O'Kane, Jr., Alcantara & Frame, Honolulu, HI, for defendant Simons.

Richard A. Lesser, Mark A. Hruska, Michele Nelson, Hruska & Lesser, Honolulu, HI, for defendants Shockley, Choquette, and Westphal.

FINDINGS OF FACT AND CONCLU-
SIONS OF LAW; ORDER DENYING
DEFENDANTS' MOTION TO
AMEND THE ORAL ORDER OF
THE COURT AWARDING DAMAGES
FOR LOSS OF SOCIETY; ORDER
DENYING DEFENDANTS' MOTION
TO FURTHER AMEND THE ORAL
ORDER OF THE COURT AWARD-
ING DAMAGES FOR FUTURE LOST
WAGES; ORDER GRANTING IN
PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR PRE-
JUDGMENT INTEREST

KURREN, United States Magistrate
Judge.

This case arises out of the death of Louis D. Tancredi, Jr. ("Tancredi") that occurred during a scuba diving expedition off the Island of Hawaii on June 30, 1988. Tancredi's parents, Catherine D. Tancredi and Louis D. Tancredi, Sr., brought this wrongful death and survivor's action against Dive Makai Charters, the dive charter company responsible for planning and conducting the guided scuba dive in question; Tom Shockley and Lisa Choquette, Dive Makai's owners; and Gary Simons and Rich Westphal, Dive Makai's vessel captain and dive master, respectively.

This case came on for trial without a jury. Having considered the evidence presented at trial and the arguments of counsel, the court finds as follows:

## I. FACTS

In June 1988, Tancredi, a 35 year-old resident of Plymouth Meeting, Pennsylvania, traveled to Hawaii for a vacation and to participate in scuba diving activity. In 1981, he had obtained the basic open-water certification supplied to divers by the recreational dive industry. Tancredi also had some experience diving in waters off the Island of Hawaii prior to his trip in 1988.

On June 29, 1988, Tancredi booked charter space with defendant Dive Makai Charters ("Dive Makai") for the following day, when another dive company was unable to accommodate him and recommended Dive Makai. Tancredi engaged Dive Makai to plan and guide a safe recreational dive in an area of the ocean approximately one mile off the coast of Kailua–Kona, Hawaii.

On June 30, 1988, Tancredi presented himself at Kailua Pier for boarding Dive Makai's vessel. He was advised that a dive scheduled for that day was to the "Deep Reef". The plan was a dive to a maximum depth of 145 feet for a maximum time of 20 minutes, with decompression stops at 20 feet for three minutes and at 10 feet for eight minutes.

The dive planned for June 30 was a dive suitable only for very experienced divers because of its depth and the fact that it required several decompression stops. Dive Makai was well aware of the substantial risks and dangers associated with such a deep dive, and it was Dive Makai's usual practice to make sure its customers were ready for the dive by having them participate in less dangerous dives before allowing them to go to the "Deep Reef" location.

Tancredi, however, was not an experienced or advanced diver capable and qualified to participate in a dive as deep as the "Deep Reef" dive planned for June 30. Tancredi also had never gone diving with Dive Makai before. He was the only diver to ever dive with Dive Makai to the "Deep Reef" location who had not been taken on a previous dive by the company. Furthermore, neither Dive Makai's owners nor the dive master, defendant Rich Westphal ("Westphal"), discussed with Tancredi in any detail his diving experience or reviewed his dive log. Dive Makai failed to determine that Tancredi was not adequately prepared for the dive to the "Deep Reef" location before taking him on the dive. However, Tancredi also knew or should have known, based on the basic certification training he had received, that he was not ready for a decompression dive as deep as 145 feet because of his inexperience.

Tancredi was not assigned a "buddy" for the dive by Westphal. The five other customers on the tour, however, were either related or knew each other and had established informal "buddy" arrangements for the dive.

The dive began with the group descending along the anchor line to approximately 137

feet where the anchor was set. During the course of the tour on the bottom, the divers descended further to a maximum depth of 145 feet in order to view black coral and associated fish. The divers stayed close to each other during the tour, although Tancredi made two short excursions away from the others to take pictures.

Approximately 19 minutes into the dive, the group returned to the anchor and began their ascent up the anchor line. Tancredi was fourth up the line followed by Dr. and Mrs. Mel Levy. As the divers began their ascent, Westphal returned to the anchor to inflate a lift bag with his own air so that the bag could later be used to pull up the anchor. Westphal used almost all of his remaining air to inflate the lift bag.

At approximately 120 feet, Tancredi dropped down to the level of the Levys and indicated to Dr. Levy by pointing to his regulator that he was having difficulty in breathing. Dr. Levy thought that Tancredi had sufficient air to make it to the surface and signaled him to ascend. Because Dr. Levy was not Tancredi's "buddy", he did not stay with Tancredi to assist him in breathing or to calm him down. Instead, Dr. Levy descended to obtain assistance from Westphal.

As Westphal approached Tancredi, Tancredi was holding the anchor line and breathing, although his eyes were dilated. Westphal could not help Tancredi because he ran out of air as a result of inflating the lift bag. Westphal motioned to Tancredi to ascend but Tancredi did not move. Since Westphal was out of air, he swam to Mrs. Levy to share air from her tank. Mrs. Levy at that time was above Tancredi. While Westphal was breathing Mrs. Levy's air, he saw Tancredi release his grip from the anchor line and saw blood emitting from Tancredi's nose and mouth. Tancredi became negatively buoyant and sank.

Westphal made a rapid ascent to the surface to obtain help, suffering decompression sickness as a result. The vessel captain, defendant Gary Simons ("Simons"), immediately entered the water in an effort to rescue Tancredi. Simons found Tancredi on the bottom at about 130 feet and brought him to the surface. CPR was unsuccessful and Tancredi died.

The court finds that during the course of the dive, Tancredi ran low on air and had difficulty in breathing, probably caused by an inadequate air supply, the stress and exertion of the dive, nitrogen narcosis, and his lack of experience in deep diving. Tancredi's breathing difficulty caused him to draw more air rapidly from his regulator, which in turn led to greater breathing difficulty. Tancredi ultimately became hypoxic and unconscious. He aspirated sea water and died as a result of drowning. Tancredi probably would not have died had he been taken to the surface when he indicated his distress to Dr. Levy and Westphal.

## II. DISCUSSION

### A. *Jurisdiction and Waiver of Defenses*

#### 1. Diversity Jurisdiction

The court has diversity jurisdiction over the action pursuant to 28 U.S.C. § 1332. A federal court sitting in diversity jurisdiction must apply the substantive law of the forum state. *Davis v. Metro. Prod., Inc.,* 885 F.2d 515, 524 (9th Cir.1989). Plaintiffs, therefore, seek a recovery under Hawaii's wrongful death statute, Haw.Rev.Stat. § 663-3, and Hawaii's survivor statutes, Haw.Rev.Stat. §§ 663-7 and 663-8.

Defendants have asserted that admiralty jurisdiction pursuant to 28 U.S.C. § 1333 is also applicable, and hence that admiralty law precludes the application of provisions of the Hawaii wrongful death and survivor statutes to this case. However, defendants did not raise this argument at any time prior to or during the trial.

At the conclusion of the trial, on December 22, 1992, the court ruled from the bench in favor of plaintiffs finding, pursuant to § 663-3, that each of Tancredi's parents is entitled to $125,000 for the loss of love, society and companionship suffered as a result of the death of Tancredi, and, pursuant to §§ 663-7 and 663-8, that Tancredi's estate is entitled to $50,000 for Tancredi's conscious pain and suffering and $86,700 for lost excess future earnings. The court also found contributory

negligence on the part of Tancredi and indicated that the damages award would be reduced by twenty percent therefor.

On February 18, 1993, defendants filed a Motion to Amend the Oral Order of the Court Awarding Damages for Loss of Society. Defendants argue that an award for loss of society is not available under general maritime law for non-dependent relatives, citing *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d ·275, 1991 A.M.C. 1 (1990); *Sea–Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974); and *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339, 1970 A.M.C. 967 (1970). On March 10, 1993, defendants filed a Motion to Further Amend the Oral Order of the Court Awarding Damages for Future Lost Wages. Defendants argue that the court's award of future lost wages is also in error based upon *Miles*. In *Miles*, the Supreme Court held that: 1) "there is no recovery for loss of society in a general maritime action for the wrongful death of a Jones Act seaman"; and 2) "a general maritime survival action cannot include recovery for [a seaman's] lost future earnings." 498 U.S. at 33, 37, 111 S.Ct. at 326, 328, 112 L.Ed.2d at 291, 294.

Defendants' motions are hereby denied. For the reasons set forth below, the court finds that general maritime law is not applicable to the circumstances of this case. The court also finds that the defenses concerning the validity of the claims for loss of society and future earnings, raised for the first time after the trial, are untimely and have been waived.

2. Application of General Maritime Law

■ In 1972, the Supreme Court presented a two-part test to determine when tort claims fall under general maritime law: (1) the wrong must occur or be located over a navigable waterway, and (2) the wrong must bear a significant relationship to traditional maritime activity. *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 267, 93 S.Ct. 493, 504, 34 L.Ed.2d 454, 467 (1972). In 1990, the Supreme Court revised the two part-test in order to emphasize that general maritime law is appropriate only "when a 'potential hazard to maritime commerce arises out of activity that bears a substantial relationship to traditional maritime activity'." *Sisson v. Ruby*, 497 U.S. 358, 362, 110 S.Ct. 2892, 2895–96, 111 L.Ed.2d 292, 299 (1990) quoting *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 675 n. 5, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300, 306 (1982).

In *Sisson*, the Supreme Court stated that courts must first "assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity" and second, determine whether the party seeking to invoke general maritime law has shown "a substantial relationship between the activity giving rise to the incident and traditional maritime activity." 497 U.S. at 363–364, 110 S.Ct. at 2896–2897, 111 L.Ed.2d at 300–301. The Supreme Court stated that "protecting commercial shipping is at the heart of admiralty jurisdiction" and " '[n]ot every accident in navigable waters that might disrupt maritime commerce will support federal admiralty jurisdiction.'" *Id.* 497 U.S. at 362, 110 S.Ct. at 2895, 111 L.Ed.2d at 299, quoting *Foremost*, 457 U.S. at 675 n. 5, 102 S.Ct. at 2658 n. 5.

Cases before the Ninth Circuit have made it clear that the relevant "activity" is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose. *Delta Country Ventures, Inc. v. Magana*, 986 F.2d 1260, 1993 A.M.C. 855 (9th Cir.1993). In *Delta*, the Ninth Circuit applied a three-part test to assess the general features of the incident to determine whether it was of a type likely to disrupt maritime commerce, and whether a substantial relationship to traditional maritime activity existed. The factors the court considered were (1) traditional concepts of the role of admiralty law, (2) the function and role of the parties, and (3) the types of vehicles and instrumentalities involved. *Id.*, 986 F.2d at 1263.

When a variation of the *Delta* test was applied to a recreational scuba diving accident in Louisiana, a district court held that general maritime law did not apply. *Duplechin v. Professional Ass'n for Diving Instr.*, 666 F.Supp. 84 (E.D.La.1987). In that case,

plaintiff hired a boat to take him to an offshore platform from which he made several deep dives, resulting in decompression illness. The court concluded that recreational scuba diving is not a traditional maritime activity.

Defendants argue that *Sinclair v. Soniform, Inc.*, 935 F.2d 599, 1991 A.M.C. 2341 (3d Cir.1991) controls here. That reliance is misplaced because the claim in that case focused on the failure of the defendants to adequately treat plaintiff after plaintiff emerged from the water and was brought back on board a vessel. In *Soniform*, the scuba diver exhibited signs of decompression sickness as soon as he surfaced from the dive, which took place some nine miles from shore. The operators of the dive boat continued the dive and did not transport the diver back to shore for two and one-half hours after he became ill. His action against the operators of the boat was based on their failure to obtain proper medical care for his obvious condition while on the boat. The court held that the crew had a duty to provide adequate care to an injured passenger and that "the transport and care of passengers bear a substantial relationship to traditional maritime activity." *Id.*, 935 F.2d at 602. The court also held that "the activity of the crew affected maritime commerce both actually and potentially." *Id.* The court found that the possibility that commercial vessels would be diverted to respond to a distress signal was as great as the potential relied upon by the Supreme Court in *Foremost* that commercial vessels would be diverted by the collision of two pleasure crafts. *Id.*

In this case, the facts are more akin to *Duplechin* than *Soniform*. Although a chartered dive boat transported Tancredi to the location where the dive took place and served as a diving platform, it had little, if any, impact on the events that transpired during Tancredi's dive that led to his death. Tancredi's death was attributed to negligent dive planning and supervision and the actions of the dive master in taking Tancredi to unsafe levels. There was no nexus between the death and any factor having to do with navigation. No impediment to, or circumstances

of, navigation caused or were related to Tancredi's death. Tancredi's death was related neither to the operation of the vessel nor the actions of the vessel's crew. In addition, the dive site was within one mile from shore and after Tancredi was brought back on board, the ship's crew sent a radio message to arrange to have an ambulance standing by at the dock when the boat came in. No other vessel was required to give assistance at sea.

There is nothing inherent in the sport of scuba diving itself that mandates that all tort actions involving scuba should fall under general maritime law. While scuba diving conducted by commercial salvage divers may fall within general maritime law, recreational scuba diving is analogous to recreational swimming. It bears little relationship to traditional maritime activity. "In *Foremost*, the Court unanimously agreed that the purpose underlying the existence of federal maritime jurisdiction is the federal interest in the protection of maritime commerce, and that a case must implicate that interest to give rise to such jurisdiction." *Sisson* 497 U.S. at 364, n. 2, 110 S.Ct. at 2896, n. 2, 111 L.Ed.2d at 300, n. 2.

Applying the three-part *Delta* test assessing the general conduct from which the incident arose, the court finds that aquatic recreation using scuba equipment at a depth exceeding 140 feet was the activity that gave rise to the incident. Although a chartered vessel was used to transport Tancredi and the other divers to the dive site less than a mile from shore, it played no further role in the incident. The events leading to Tancredi's death could just as easily have occurred if the dive had been made from shore. Similarly, the function and role of the parties to this incident had little, if any relationship to the boat. As noted by the Ninth Circuit in *Delta*, 986 F.2d at 1262 n. 1, to hold that this case falls within admiralty law merely because the death took place 120 feet beneath a vessel engaged in the traditional maritime activity of transporting passengers to the site would be to reinstate the maritime locality test that was explicitly revised in *Sisson* and *Executive Jet*.

Finally, traditional concepts of the role of admiralty law were not involved. At no time

did the events surrounding Tancredi's death create any potentially disruptive impact on maritime commerce that was substantially related to traditional maritime activity within the meaning of *Sisson* and *Delta.*

In sum, this court finds that it has jurisdiction in diversity only, that Hawaii state law applies and that general maritime law is inapplicable to the circumstances of this case.

### 3. Waiver of Defenses

As an alternative basis for the court's ruling, the court finds that any objection to the court's application of Hawaii law has been untimely raised. Defendants did not argue that the parents were absolutely barred under general maritime law from receiving damages for loss of society until two months after the trial concluded. Similarly defendants did not assert until after the trial was over that decedent's estate was absolutely barred under general maritime law from recovering future lost wages. Defendants challenged the court's award for loss of society and future lost wages after the trial concluded as if these matters were never touched on. During the course of the trial, substantial evidence was presented on both these issues.

As a threshold matter, defendants contend that their objection is not waivable because it is a jurisdictional matter that may be raised at any time pursuant to Fed. R.Civ.P. 12(h)(3). This argument lacks merit since defendants do not contend, as required by Rule 12, that this court lacks subject matter jurisdiction[1], but rather that the court erred in applying Hawaii law instead of the general maritime common law. Thus, defendants are not challenging this court's jurisdiction; they are asserting defenses to the court's choice of law.

Fed.R.Civ.P. 8(c) provides that a responsive pleading must set forth certain enumerated affirmative defenses and/or "any other matter constituting an avoidance or affirmative defense." Failure to plead an affirmative defense results in the waiver of that defense and its exclusion from the case. *See In re Allustiarte,* 786 F.2d 910, 914 (9th Cir.), *cert. denied,* 479 U.S. 847, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986); C. Wright and A. Miller, Federal Practice and Procedure: Civil § 1278 (1990).

The purpose behind Rule 8(c) is to give the plaintiff adequate notice prior to trial of the defenses that defendant intends to assert. *Bank Leumi Le–Israel v. Lee,* 928 F.2d 232, 235 (7th Cir.1991). As stated in the case of *Ingraham v. U.S.,* 808 F.2d 1075, 1079 (5th Cir.1987) (citations omitted):

> Central to requiring the pleading of affirmative defenses is the prevention of unfair surprise. A defendant should not be permitted to "lie behind a log" and ambush a plaintiff with an unexpected defense.

Several courts have refused to consider affirmative defenses challenging damage awards that ran counter to law because they were untimely raised. In *Ingraham* the court found that a statutory limitation on liability constituted an affirmative defense under Rule 8(c) and the government's failure to refer to this statute in any of its pleadings or during trial constituted an "avoidance" within the intendment of the residuary clause of Rule 8(c). In *Wirtz v. F.M. Sloan, Inc.,* 285 F.Supp. 669 (W.D.Pa.1968), aff'd 411 F.2d 56 (3d Cir.1969), the defendant moved to amend judgment on the grounds that certain employees were exempted from certain provisions of the Fair Labor Standards Act. The court rejected the amendment, noting that "[n]o such contention was made in defendant's pretrial statement, the pretrial stipulation, at the pretrial conference, at the trial, in defendant's request for findings, or in its brief." *Id.* at 674–75. *See also Systems Incorporated v. Bridge Electronics Company,* 335 F.2d 465 (3rd Cir.1964).

In this case, defendants made a general assertion that admiralty law applied in their trial brief. In their answer they pled as an affirmative defense limitation of liability provided to shipowners by 46 U.S.C. §§ 183–189. They also included in their answer a catch-all statement that they intended to rely upon any other matter constituting an avoidance or affirmative defense pursuant to Rule 8(c). Although absolute specificity in plead-

---

1. The court clearly has jurisdiction here based on the diversity of citizenship of the parties.

ing is not required, fair notice of an affirmative defense is. Fed.R.Civ.P. 8(f). Defendants' general statement was insufficient to provide such notice or prevent unfair surprise to the opposing party and it did not serve to leave the door open to raise more specific affirmative defenses after the conclusion of trial. Raising an affirmative defense at this late date is unfair and highly prejudicial to plaintiffs.

While the court finds that admiralty law is inapplicable to the circumstances of this case, even if it were, defendants' specific affirmative defense asserting that general maritime law prohibits damages for loss of society and future lost wages, brought long after the conclusion of trial, was an avoidance within the meaning of Rule 8(c). As such, it is deemed to have been waived.

### B. *Negligence and Causation*

A cause of action founded on negligence requires:

1. A duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct for the protection of others against unreasonable risks[;]

2. A failure on the [defendant's] part to conform to the standard required: A breach of duty ...[;]

3. A reasonably close causal connection between the conduct and the resulting injury.... [and]

4. Actual loss or damage....

*Knodle v. Waikiki Gateway Hotel, Inc.*, 69 Haw. 376, 385, 742 P.2d 377, 383 (1987) (quoting W.P. Keeton, *Prosser and Keeton on the Law of Torts*, § 30, at 164–65 (5th Ed.1984)). "Negligence can result from a failure to act as well as from affirmative acts." *Quality Furniture, Inc. v. Hay*, 61 Haw. 89, 92, 595 P.2d 1066, 1068 (1979).

Generally, a person owes a duty of care to all foreseeable plaintiffs "subjected to an unreasonable risk of harm by the actor's negligence conduct." *Seibel v. City and County of Honolulu*, 61 Haw. 253, 602 P.2d 532, 536 (1979). It is not necessary that the exact manner of the accident or injury be foreseeable. *Okada v. State*, 1 Haw.App. 101, 614

P.2d 407 (1980). The test of what is reasonably foreseeable is "whether 'there is some probability of harm sufficiently serious that [a reasonable and prudent person] would take precautions to avoid it.'" *Knodle v. Waikiki Gateway Hotel, Inc.*, 69 Haw. at 388, 742 P.2d at 385 (citations omitted).

The evidence in this case established that defendants Dive Makai Charters, Lisa Choquette, Tom Shockley and Rich Westphal (hereinafter referred to collectively as "Dive Makai defendants") owed Tancredi a duty to provide a reasonably safe dive plan, to make sure prior to the dive that he was qualified to participate in the dive, to inform him prior to the dive of the risks associated with a deep dive and the fact that diving to a depth of 145 feet is not recommended by the national diving agencies, and to conduct the dive in a reasonably safe manner. Based on the evidence presented, the court finds that the Dive Makai defendants breached their duties as set forth above.

The risks involved in recreational scuba diving increase with the depth of the dive. As a diver goes deeper, his air consumption increases. His body absorbs more nitrogen, causing impaired judgment and an increased risk of decompression sickness. At depths below 100 feet, and at tank volumes below 1000 psi, divers start to experience a marked increase in breathing resistance. If a diver is under physical or mental stress, he may over-breath his regulator and increase breathing resistance even further. The national diving agencies, including the National Association of Underwater Instructors ("NAUI") and the Professional Association of Diving Instructors ("PADI"), recommend that sport divers not go below 100 feet and have established 130 feet as an absolute limit for recreational diving because of the hazards inherent in deep diving. NAUI and PADI also recommend against decompression diving for sport divers, citing the dangers associated with such dives.

The Dive Makai defendants in this case were negligent in planning a dive for Tancredi to 145 feet for 20 minutes, since Tancredi had inadequate experience. The margin of safety for the dive plan was narrow for even the most qualified divers. It

was far too narrow for a diver such as Tancredi. Tancredi was not qualified and did not have the requisite experience to participate in the dive to the "Deep Reef".

■ The Dive Makai defendants were negligent in failing to fully inquire as to Tancredi's dive qualifications. The investigation of Tancredi's diving experience and qualifications fell below the average level of inquiry practiced by the recreational dive industry at the time of the dive in question.

■ The Dive Makai defendants were also negligent in failing to inform Tancredi of the NAUI and PADI recommendations against such deep diving and the risks and dangers involved in exceeding those recommendations.

■ The Dive Makai defendants were negligent in providing Tancredi an insufficient supply of air in light of his relative inexperience. Tancredi's inadequate air supply contributed to his breathing difficulty, which in turn caused him to consume his remaining air more rapidly.

■ The Dive Makai defendants were negligent in not assigning a "buddy" for Tancredi. The evidence indicated that it is a breach of the standard of care in the recreational dive industry for a dive charter company to conduct a dive without assigning "buddy" teams. A "buddy" assumes the responsibility for monitoring and assisting the other member of the "buddy" team at all times during a dive. The court finds that it is probable that an assigned "buddy" would have assisted Tancredi by giving Tancredi additional air when he first indicated breathing difficulty and would have helped Tancredi to the surface at a time when his life could have been saved.

■ The Dive Makai defendants were negligent in planning and conducting a dive in which the dive master used up almost all of his reserve air to fill up an anchor lift bag when Dive Makai customers were still ascending. By filling up the anchor lift bag with his reserve air, Westphal was unable to provide appropriate assistance to Tancredi in an emergency situation, and he was negligent therefor. If Westphal had retained sufficient air, he could have provided air to Tancredi when he reached Tancredi at 120 feet, and he would have been in a position to immediately take Tancredi to the surface. Those actions would likely have saved Tancredi's life.

■ The court finds, however, that Simons, the vessel captain, did not breach any duty owed to Tancredi. His primary responsibility was to operate the dive boat in a safe and reasonable manner. Simons was not responsible for planning, marketing, or for the conduct of the dive in question. The court finds that Simons carried out his responsibilities in an appropriate manner. The court also does not find any fault with Simons' unsuccessful effort to rescue Tancredi. The court therefore finds that Simons was not negligent.

An injured person cannot recover for damages caused him unless the negligent conduct upon which his claim is based is a legal cause of the damage of which he complains. *Knodle,* 69 Haw. at 390, 742 P.2d at 386; *Mitchell v. Branch,* 45 Haw. 128, 132, 363 P.2d 969, 973 (1961). "[An] actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence had resulted in harm." *Restatement (Second) of Torts* § 431 (1965).

■ The evidence presented established that the negligence of the Dive Makai defendants was a legal cause of Tancredi's death. The breach of duties owed to Tancredi, as outlined above, substantially contributed to his death.

## C. *Defenses*

### 1. Assumption of Risk

Defendants assert that implied assumption of risk operates as a complete bar to plaintiffs' recovery. Defendants argue that Tancredi was a certified, experienced scuba diver who was on notice that a risk of injury is inherent in scuba diving and that one who knowingly chooses to participate in scuba diving must be considered to have assumed the risk of its inherent dangers.

Plaintiffs argue that since the adoption of Hawaii's comparative negligence statute, Haw.Rev.Stat. § 663–31, assumption of risk is no longer a viable defense. Plaintiffs assert that at most Tancredi's conduct can be considered in apportioning fault, but it cannot totally bar their claims under the doctrine of assumption of risk.

■■■ The doctrine of assumption of risk includes issues of whether or not defendant had a legal duty to plaintiff and breached it, whether or not plaintiff knowingly, freely and deliberately chose to put himself in peril, and whether or not plaintiff's conduct was itself unreasonable. Restatement (Second) of Torts 2d § 496 A. Assumption of risk may be express, in the sense of an express contract, or implied. Express assumption of risk in Hawaii is available as a separate defense that may bar a plaintiff's recovery in tort. *Larsen v. Pacesetter Systems, Inc.* 837 P.2d 1273, 1291 (Hawaii 1992). Implied assumption of risk has been used in the context of negligence cases to describe two distinct theories under which a defendant may avoid liability; primary and secondary implied assumption of risk. *See* Restatement (Second) of Torts, § 496A comment c. The Hawaii Supreme Court has not yet addressed implied assumption of risk, either secondary or primary, in the context of recreational sports.[2]

As a court sitting in diversity, this court must "use its best judgment in predicting how the state's highest court would decide the case." *Takahashi v. Loomis Armored Car Service,* 625 F.2d 314, 316 (9th Cir.1980) The court has considered the position taken by California courts that the defense of primary implied assumption of the risk survived the adoption of California's comparative negligence statute, the position of the Hawaii Supreme Court in *Larsen,* and Hawaii's comparative negligence statute, and believes that

the Hawaii Supreme Court would allow the defense in an appropriate sports-related case. This is not such a case, however.

Courts that have held that implied assumption of risk operates as a complete bar to a negligence action in a recreational sports setting have looked closely at the nature of the activity at issue and the parties' relationship to that activity. *See e.g. Knight v. Jewett,* 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696 (1992) (a defense where a finger was stepped on by a fellow participant in a touch football game); *Ford v. Gouin,* 3 Cal.4th 339, 11 Cal.Rptr.2d 30, 834 P.2d 724 (1992) (a defense where the back of water skier's head was hit by a tree limb). In *Krol v. Sampson,* 6 Cal.App.4th 310, 278 Cal.Rptr. 164, review granted and opinion superseded, 282 Cal. Rptr. 124, 811 P.2d 10 (1991), the court held that the defense of reasonable implied assumption of the risk survived California's adoption of a comparative negligence system.

## 2. Primary Assumption of Risk

■■■ Primary implied assumption of risk considers two factors. First, whether defendant owed a legal duty to protect plaintiff from the particular risk of harm that caused the injury. Second, and most importantly, whether plaintiff had both knowledge and a full appreciation of the danger involved and voluntarily and deliberately exposed himself to the risk. Such an intentional exposure to a known risk negates defendant's liability.

Assumption of the risk acts as a complete bar where plaintiff's conduct in assuming a particular risk was reasonable (for instance, where a spectator chooses to attend a baseball game and as a consequence is injured by a stray ball). A successful pleading of assumption of the risk precludes a finding of breach of duty. *See* Comment Note—Dis-

**2.** In *Larsen,* at 1290, the Hawaii Supreme Court defined primary assumption of risk in a products liability case as follows:
> Used in its primary sense, assumption of the risk describes the act of a plaintiff, who has entered voluntarily and reasonably into some relation with a defendant, which plaintiff knows to involve the risk. It is an alternate expression of the proposition that a defendant owes no duty to a plaintiff [citations omitted].

The Hawaii Supreme Court in *Larsen* abolished primary assumption of risk in strict products liability and implied warranty actions for personal injury. The Court went on to describe secondary implied assumption of risk as a form of contributory negligence that "describes a situation where plaintiff knows of the danger presented by a defendant's negligence and proceeds voluntarily and unreasonably to encounter it."

tinction Between Assumption of Risk and contributory Negligence, 82 A.L.R.2d 1227, citing *Meistrich v. Casino Arena Attractions, Inc.,* 31 N.J. 44, 155 A.2d 90 (1959).

In cases of sports injuries, "the nature of the sport is highly relevant in defining the duty of care owed by a particular defendant." *Knight,* 11 Cal.Rptr.2d at 14, 834 P.2d at 708.

Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport. *Id.*

"The scope of the legal duty owed by a defendant frequently will also depend on the defendant's role in, or relationship to, the sport." *Id.,* 11 Cal.Rptr.2d at 15, 834 P.2d at 709. Although defendants have cited several cases involving assumption of risk in cases involving co-participants in a sport, this case does not involve co-participants. A case more on point is *Benitez v. New York City Board of Education,* 73 N.Y.2d 650, 543 N.Y.S.2d 29, 541 N.E.2d 29 (1989). In that case, a high school football player was seriously injured in a mismatched football game and sued the school board. On appeal, the court held that since plaintiff voluntarily assumed the risks inherent in the football game, the defendant owed plaintiff a duty of ordinary reasonable care to protect him from unassumed, concealed, or unreasonably increased risks, none of which were present in the case. *Id.,* 543 N.Y.S.2d at 33, 541 N.E.2d at 33.

"The court must look to the steps the sponsoring business entity reasonably should be obligated to take in order to minimize the risks without altering the nature of the sport." *Knight,* 11 Cal.Rptr.2d at 15, 834 P.2d at 709, citing *inter alia Shurman v. Fresno Ice Rink,* 91 Cal.App.2d 469, 474–477, 205 P.2d 77 (1949). *See also Danieley v. Goldmine Ski Associates, Inc.,* 218 Cal. App.3d 111, 266 Cal.Rptr. 749 (1990). In such cases, the issue is whether defendants caused or contributed to the plaintiff's injuries, either by affirmative misconduct or by a failure to act. *Knight,* 11 Cal.Rptr.2d at 16,

834 P.2d at 710. A proprietor is not require to protect customers from "inherent, obvious and unavoidable risks" in a sport. *See Goldmine,* 266 Cal.Rptr. at 755, citing *Rowland v. Christian,* 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561 (1968).

■ This court has already examined defendants' duty and breach of duty in relation to Tancredi, the inherent risks of recreational scuba diving, and defendants' role in and relationship to the sport. The court must now determine whether Tancredi knowingly and voluntarily encountered not only the inherent risks involved in recreational scuba diving, but the inherent risks involved in the particular type of dive that led to his death. In this situation the focus is whether the injured person's risk-assuming conduct is considered "reasonable". Some courts look to whether or not the particular plaintiff subjectively knew, rather than simply should have known, of both the existence and magnitude of the specific risk of harm imposed by defendant's negligence, rather than at the nature of the sport itself. *See Knight,* 11 Cal.Rptr.2d at 12, 834 P.2d at 706.

Although there are inherent risks in recreational scuba diving, they can be minimized if a diver is well trained and acts responsibly, his equipment is in good shape and his dive plan follows industry guidelines as to maximum depth and time spent at depth. The risks increase, however, with the depth of the dive. A diver out of air at thirty feet needs only thirty seconds to safely ascend to the surface; a diver out of air at 120 feet needs two minutes. As a diver goes deeper his air consumption rate increases and his body absorbs more and more nitrogen, causing impaired judgment and increased risk of decompression injury. As a trained diver, plaintiff should have been aware of the inherent risks of scuba diving.

However, this was not a case where Tancredi planned his own dive. He was a tourist on vacation. He entrusted the planning of a safe dive to an experienced professional dive company and the company planned a deep dive that pushed the industry safety margin. As a trained diver, Tancredi should have at least partially appreciated the significance of

a dive to a maximum of 145 feet for 20 minutes. However, Tancredi was not so experienced that he fully understood all the ramifications of diving to that deep for that long. What Tancredi apparently did not fully appreciate was the magnified effect that actively swimming on the bottom would have on his air supply, the effort it would take to draw on his regulator at low levels of air at deep depths, and the effect that deep diving would have on his judgment. Therefore, the court finds that while plaintiff was or should have been aware of the inherent dangers of scuba diving, he did not have the knowledge and experience to appreciate the inherent dangers of the type of dive that caused his death. In short, his decision to participate in the deep dive was not a fully informed decision and cannot be considered 100% voluntary. Therefore, under the circumstances of this case, primary implied assumption of the risk is not a defense.

### 3. Secondary Implied Assumption of Risk and Contributory Negligence

■ In secondary implied assumption of risk, the inquiry is whether or not plaintiff's conduct was unreasonable. It is a form of contributory negligence and the question is to what extent did Tancredi breach a duty of care for his own safety. In Hawaii, secondary implied assumption of risk is a form of comparative negligence to be compared against defendant's fault. "Where comparative negligence principles apply, assumption of risk that is a form of contributory negligence serves to reduce, rather than bar, plaintiff's recovery." *Larsen* 837 P.2d at 1290, *citing Kaneko v. Hilo Coast Processing*, 65 Haw. 447, 463, 654 P.2d 343, 352 (1982); *Bulatao v. Kauai Motors, Ltd.*, 49 Haw. 1, 15, 406 P.2d 887, 895, *reh'g denied*, 49 Haw. 42, 408 P.2d 396 (1965). The trier of fact, in apportioning the loss resulting from the injury, may consider the relative responsibilities of the parties.

■ Tancredi was informed when he arrived at Kailua Pier that the scheduled dive was to the "Deep Reef". As noted previously, he was a trained diver with some experience, including experience diving in Hawaii. As a trained diver, Tancredi should have at least partially appreciated the significance of a dive to a maximum of 145 feet for 20 minutes and should have considered that it might be beyond his capabilities. However, once Tancredi boarded the boat and left the harbor it is not reasonable to presume that he could have made the choice not to dive, even if he was given some warning by the dive master. Once the boat left shore, Tancredi's only choice was to go on the deep dive with the others or sit it out, clearly a choice Tancredi could not be expected to make.

Finally, once Tancredi arrived at the bottom, the effect that nitrogen absorption has on human judgment tends to negate any lack of due care he may have shown for his own welfare. Therefore, this court holds that plaintiff was twenty percent contributorily negligent in this case.

### D. *Damages*

■ Hawaii's survivor statute provides *inter alia* that "any damages recovered shall form part of the estate of the deceased." Haw.Rev.Stat. § 663–7. Under this statute, the estate can recover for the pain and suffering of the decedent. *Furumizo v. United States*, 245 F.Supp. 981, 1015 (1965), aff'd, 381 F.2d 965 (9th Cir.1967). The court finds that Tancredi did experience distress, pain and suffering when he had difficulty in breathing and died as a result of drowning. Based on the evidence presented, the court finds that plaintiffs are entitled to $50,000 for Tancredi's conscious pain and suffering.

■ Haw.Rev.Stat. § 663–8 entitles the estate to recover for "the future excess earnings of the decedent in excess of the probable cost of the decedent's own maintenance ... during the period of time decedent would have likely lived but for the accident." At the time of his death, Tancredi was working in a retail and manufacturing business in Pennsylvania, earning approximately $22,000 per year. Although Tancredi had considered leaving his job and moving to Hawaii, no such arrangements had been made. The court finds, based on the evidence, that Tancredi probably would have continued to live and work in Pennsylvania, and that his income level would increase to some extent in light of his good working relationship with

his employer. The court also finds that the formulas employed by plaintiffs' economic expert, Dr. Jack Suyderhoud, to calculate Tancredi's economic loss are sound. The court finds that the present value of future earnings lost to Tancredi's estate after deductions are made for maintenance is $86,700.

■ Pursuant to Hawaii's wrongful death statute, Haw.Rev.Stat. § 663–3, the mother and father of Tancredi are entitled to:

Fair and just compensation, with reference to the pecuniary injury and loss of love and affection, including (1) loss of society, companionship, comfort, consortium ... (3) loss of filial care or attention ... suffered as a result of the death of the person.

Tancredi was an only child. He had a normal, close and loving relationship with his parents. Tancredi did not provide monetary support to either parent. However, he maintained regular contact with them during his adult life. The court finds that Catherine D. Tancredi and Louis D. Tancredi, Sr. are each entitled to $125,000 for the loss of their son.

The damages awarded in the amount of $386,700.00 shall be reduced by $77,340 for the twenty percent contributory negligence of Tancredi. Plaintiffs are therefore entitled to $309,360, plus costs of court and prejudgment interest.

### E. *Prejudgment Interest*

Plaintiffs have moved for prejudgment interest upon the damages awarded from the date of Tancredi's death until the date of judgment entered in this action in the amount of ten percent per annum.

■ In diversity cases, state law governs the award of prejudgment interest. *United California Bank v. THC Financial Corp.,* 557 F.2d 1351 (9th Cir.1977). Under Hawaii law, the award of prejudgment interest is within the discretion of the court. Haw.Rev. Stat. § 636–16; *Schmidt v. Board of Dirs. of Association of Apartment Owners of Marco Polo Apartments,* 73 Haw. 526, 533, 836 P.2d 479, 483 (1992).

■ In the present case, where the plaintiffs have had to wait a substantial period of time between the time of Tancredi's death in 1988 and the date of judgment, an award of prejudgment interest is appropriate. The court finds that the appropriate date from which prejudgment interest should accrue in order to fully compensate plaintiffs for their loss is the date of the complaint. Accordingly, prejudgment interest will be calculated from November 8, 1989 until the date of the judgment. The interest rate this court must apply under Hawaii law is ten percent per annum. Haw.Rev.Stat. § 478–2.

### III. CONCLUSION

Pursuant to the court's Findings of Fact and Conclusions of Law, the court hereby directs entry of judgment in favor of plaintiffs and against defendants Dive Makai Charters, Tom Shockley, Lisa Choquette and Rich Westphal in the amount of $309,360, together with costs of court, and prejudgment interest in the amount of $168,509.55, calculated as follows:

| Date | Interest Rate | × | Amount | = | Accrued Interest | Total |
|------|------|---|--------|---|--------|-------|
| 11/8/89 | 10% | | $309,360.00 | | $ 30,936.00 | $340,296.00 |
| 11/8/90 | 10% | | $340,296.00 | | $ 34,029.60 | $374,325.60 |
| 11/8/91 | 10% | | $374,325.60 | | $ 37,432.56 | $411,756.16 |
| 11/8/92 | 10% | | $411,756.16 | | $ 41,175.62 | $452,933.78 |
| 5/28/93 | *10% | | $452,933.78 | | $ 24,935.77 | $477,869.55 |
| | | | Total | | $168,509.55 | $477,869.55 |

$$\frac{*10\%}{\text{daily interest}} = \frac{.0273972 \times \$452,933.78 \times 201 \text{ days}}{\$124.06}$$

| | |
|---|---|
| Judgment | $309,360.00 |
| Interest on damages awarded | 168,509.55 |
| Total | $477,869.55 |

For the reasons set forth above, the court also directs entry of judgment in favor of defendant Gary Simons and against plaintiffs.

The Clerk of Court is hereby directed to enter judgment forthwith.

IT IS SO ORDERED.