In the Matter of The Complaint of KANOA, INC. dba Body Glove, a Nevada corporation, as owner of Body Glove, for exoneration from or limitation of liability.

Civ. No. 94–00216 ACK.

United States District Court, D. Hawai'i.

Nov. 29, 1994.

Robert G. Frame, Leonard F. Alcantara, John O'Kane, Jr., Alcantara & Frame, Honolulu, HI, for Kanoa, Inc.

Jeffrey T. Ono, Howard F. McPheeters, Burke Sakai McPheeters Bordner & Gilardy, Honolulu, HI, Kevin S.W. Chee, Chee & Markham, Honolulu, HI, for Professional Ass'n of Dive Instructors.

Jeffrey T. Ono, Howard F. McPheeters, Burke Sakai McPheeters Bordner & Gilardy, Honolulu, HI, for Roger Johnson.

Howard G. McPherson, Goodsill Anderson Quinn & Stifel, Honolulu, HI, John T. O'Connell, O'Connell & Associates, P.C., Boston, MA, for Madonna Licata.

Howard G. McPherson, Goodsill Anderson Quinn & Stifel, Honolulu, HI, for Philip Licata.

Richard A. Lesser, Hruska & Lesser, Honolulu, HI, for Dive N' Surf, Inc.

### ORDER GRANTING CLAIMANT'S MOTION TO DISMISS

KAY, Chief Judge.

### BACKGROUND

This case arises out of the death of Philip Licata ("Licata") on October 10, 1993, during a recreational scuba diving expedition from a commercial dive vessel off the Island of Hawaii. The expedition was run by Limitation Plaintiff Kanoa, Inc., dba Body Glove ("Kanoa"). On March 21, 1994, Kanoa filed a Complaint for Exoneration from or Limitation of Liability in this Court pursuant to federal admiralty/maritime jurisdiction.

Philip Licata's widow, Madonna Licata, filed this motion on August 23, 1994, seeking dismissal of Kanoa's complaint on the ground this Court lacks subject matter jurisdiction. The question thus presented is whether claims arising from recreational scuba diving from a commercial vessel are cognizable in admiralty.

### FACTS

On October 10, 1993, Philip and Madonna Licata engaged in a tourist excursion aboard the Body Glove, a boat wholly owned and operated by Kanoa. In addition to sailing and dining, excursions on the Body Glove included swimming, snorkeling and trolling for game fish. For an additional fee, both novice and experienced passengers could join scuba diving expeditions, with the novices receiving an introductory scuba briefing on the boat. Philip Licata, wanting to try scuba diving, signed up for the introductory session while Madonna Licata only engaged in the snorkeling activities.

The introductory scuba diving event was conducted by Roger Johnson ("Johnson"), a dive instructor employed by Kanoa and certified through the Professional Association of Dive Instructors ("PADI"). The dive was undertaken at a site commonly known as the "Golden Arches", located off the Kona Coast. On the way to the dive site, Philip Licata and the other five novices participating in the scuba program were given a 20 minute dive briefing by Roger Johnson. During the

course of the dive, Licata became separated from the group and was found at the surface by a videographer. Licata was immediately brought aboard the boat and checked for pulse and breathing by a registered nurse who happened to be with the expedition. No pulse or breathing were found.

The crew signalled the snorkelers, including Madonna Licata, to return to the boat and proceeded back to Kailua Pier, radioing ahead for an ambulance to meet them. Johnson and the other scuba participants were picked up and returned to Kailua by another boat.

Paramedics met the Body Glove at the pier and took Philip Licata to the Kona Hospital. He was pronounced dead on arrival. A subsequent autopsy report determined he died of pulmonary overexpansion syndrome. In lay terms, Licata's lungs became overinflated and exploded when he surfaced rapidly without breathing.

Asserting admiralty jurisdiction, Kanoa filed this limitation action on March 21, 1994. Upon application, an Order retaining suit against Kanoa outside of this action was entered by this Court on March 28, 1994.

### STANDARD

■ On a motion to dismiss for lack of subject matter jurisdiction under 12(b)(1), Federal Rules of Civil Procedure, the plaintiff's allegations are not presumed to be truthful, and the plaintiff has the burden of proof that jurisdiction exists. *Thornhill Publishing Co., Inc. v. General Telephone & Electronics Corporation,* 594 F.2d 730, 733 (9th Cir.1979). "[A] Rule 12(b)(1) motion can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency," whereupon the plaintiff must "present affidavits or any other evidence necessary to satisfy its burden." *St. Clair v. City of Chico,* 880 F.2d 199, 201 (9th Cir.1989), *cert. denied,* 493 U.S. 993, 110 S.Ct. 541, 107 L.Ed.2d 539 (1989).

### DISCUSSION

### I. MARITIME JURISDICTION OVER TORT ACTIONS

District courts have original and exclusive jurisdiction over any civil case of admiralty or maritime jurisdiction pursuant to 28 U.S.C. § 1333(1). Traditionally, whether a tort action was "maritime" depended on the locality of the wrong. *Executive Jet Aviation v. City of Cleveland, Ohio,* 409 U.S. 249, 253, 93 S.Ct. 493, 497, 34 L.Ed.2d 454 (1972). "If the wrong occurred on navigable waters, the action [was] within admiralty jurisdiction; if the wrong occurred on land, it [was] not." *Id.*

Over the years, it became apparent that strict application of the locality test sometimes created absurd results. *Id.* at 254–55, 93 S.Ct. at 497–98. For example, under the locality test, federal jurisdiction and substantive admiralty law would be applied where a swimmer was injured at a public beach by another swimmer, or where a piece of machinery was dropped into a harbor by a land-based crane. To alleviate such results, many courts held that to invoke admiralty jurisdiction there must be a nexus between the tort and traditional maritime activities in addition to the maritime locality of the tort. *E.g., Gowdy v. United States,* 412 F.2d 525, 527–29 (9th Cir.1969); *Peytavin v. Government Employees Insurance Co.,* 453 F.2d 1121 (5th Cir.1972).

In 1972, the United States Supreme Court joined these courts, holding that airplane accidents are generally not cognizable in admiralty because they lack a significant relationship to traditional maritime activity. *Executive Jet,* 409 U.S. at 268, 93 S.Ct. at 504. The action in *Executive Jet* involved an airplane that struck a flock of sea gulls and crashed into the navigable waters of Lake Erie. *Id.* at 250, 93 S.Ct. at 495–96. According to the Court, basing jurisdiction on where the plane ended up could be "wholly fortuitous and completely unrelated to the tort itself." *Id.* at 267, 93 S.Ct. at 504. The Court reasoned that "it is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity." *Id.* at 268, 93 S.Ct. at 504. The *Executive Jet* Court cautioned that any expansion of admiralty jurisdiction be undertaken with extreme caution to protect the role of state

courts in tort actions. *Id.* at 272, 93 S.Ct. at 506. The states' interest in tortious injuries occurring within their borders or to their citizens must be balanced against the need for uniform rules of conduct to govern maritime vessels. In the case at bar, the Court concluded that the Ohio courts could apply familiar concepts of Ohio tort law to an airplane crash without any effect on maritime endeavors. *Id.* at 273, 93 S.Ct. at 506–07.

■ While the express holding of *Executive Jet* was limited to aviation torts, in *Foremost Insurance Company v. Richardson*, the United States Supreme Court approved a broader interpretation of the nexus rule to include other torts occurring in navigable waters. 457 U.S. 668, 673, 102 S.Ct. 2654, 2657, 73 L.Ed.2d 300 (1982) (collision of two pleasure craft in navigable waters bore sufficient relationship to traditional maritime activity to fall within federal admiralty jurisdiction). This case is also important for its application of admiralty jurisdiction to the collision of two pleasure craft. Clearly, it can no longer be argued that admiralty jurisdiction is limited to those individuals actually engaged in commercial maritime activity. *Id.* at 674–76, 102 S.Ct. at 2658–59. The *Foremost* Court reasoned that basing admiralty jurisdiction on whether a boat was used for commercial or recreational purposes would be as fortuitous as basing jurisdiction on where a plane crashed. *See id.* at 676, 102 S.Ct. at 2659. Rather, the Court concluded that "the smooth flow of maritime commerce is promoted when all vessel operators are subject to the same duties and liabilities." *Id.*

In 1990, the Supreme Court refined its test for admiralty jurisdiction requiring that:

(1) the incident pose a potential impact to maritime commerce; and

(2) the activity giving rise to the incident bear a substantial relationship to traditional maritime activity.

*Sisson v. Ruby*, 497 U.S. 358, 362–63, 110 S.Ct. 2892, 2895–96, 111 L.Ed.2d 292 (1990). *Sisson* involved a fire which started in the laundry unit of a yacht, docked at a marina in navigable waters. The Court reasoned that the potential disruption of commerce must be determined according to the general character of the incident rather than the incident's actual effect on maritime commerce or the particular facts of the incident. *Id.* at 363, 110 S.Ct. at 2896. In *Sisson,* the Court found that a fire on a vessel docked at a marina on navigable waters clearly created a potential disruption of maritime commerce.

The *Sisson* Court likewise reasoned that the activity giving rise to the incident should be determined by the general conduct from which the incident arose rather than the specific facts of the incident. *Id.* Accordingly, the Court found that the general activity in which the fire arose was the storage and maintenance of the yacht. The cause of the fire or the fact that the fire started in the yacht's laundry unit were irrelevant to the jurisdictional question. Moreover, the Court concluded that storing and maintaining a yacht in navigable waters bore a sufficient relationship to traditional maritime activity to support admiralty jurisdiction.

■ The *Sisson* Court thus clearly recognized that navigation is not the only "maritime activity" sufficient to invoke admiralty jurisdiction. *Id.* at 366, 110 S.Ct. at 2898. Indeed, the Court concluded that a nexus with any activity traditionally undertaken by commercial and noncommercial vessels will satisfy the second branch of the Court's two part test. *Id.* at 366–67, 110 S.Ct. at 2898.

The Ninth Circuit further applies a four-part test to determine whether an incident bears a substantial relationship to traditional maritime activity:

(1) traditional concepts of the role of admiralty law;

(2) the function and role of the parties;

(3) the types of vehicles and instrumentalities involved; and

(4) the nature of the injury suffered.[1]

*Delta Country Ventures, Inc. v. Magana*, 986 F.2d 1260, 1263 (9th Cir.1993). The *Delta* court addressed the issue of whether admi-

---

1. Prior to *Sisson,* the Ninth Circuit also considered the causation of the injury. However, in *Delta Country Ventures,* the court recognized that *Sisson* precluded this factually inquiry. *Delta Country Ventures,* 986 F.2d at 1263.

ralty jurisdiction could be asserted over the claim of a houseboat guest who sustained personal injuries as a result of diving off of the boat while it was moored in tidal waters. *Id.* at 1263. The court rejected the defendant's argument that the relevant activity was the mooring or anchoring of a boat in tidal waters and the examination of tidal changes. Rather, the court defined the general activity giving rise to the incident as "aquatic recreation off a pleasure boat." Applying the four factor test, the court concluded that this activity lacked a substantial relationship with traditional maritime activity.[2]

## II. *MARITIME JURISDICTION OVER SCUBA DIVING ACCIDENTS*

■ Neither the United States Supreme Court nor the Ninth Circuit have addressed whether scuba diving from a commercial dive vessel bears a sufficient relationship with traditional maritime activity to invoke admiralty jurisdiction. Magistrate Kurren of the District of Hawaii, however, concluded that it did not. *Tancredi v. Dive Makai Charters,* 823 F.Supp. 778, 784. (Dist.Haw.1993). *Tancredi* arose out of the death of a diver during a scuba diving expedition off of the Island of Hawaii, and involved allegations of negligence by the individuals operating and supervising the dive. *Id.* at 781. The guided expedition was planned and conducted by Dive Makai Charters ("Makai") the charter company that owned the boat the expedition was conducted off of. The district court found that Tancredi ran low on air and had difficulty in breathing during the dive and that he eventually became hypoxic and unconscious. *Id.* at 782. He aspirated sea water and died as a result of drowning.

Magistrate Kurren found that the relevant activity giving rise to Tancredi's death was "aquatic recreation using scuba equipment at a depth exceeding 140 feet." *Id.* at 784. Applying the *Delta* test, the court concluded that this activity was not substantially related to traditional maritime activity. *Id.* In particular, the court reasoned that the dive boat simply served as a dive platform and played no role in the incident. Moreover, the

function and role of the parties to the incident had little, if any, relationship to the boat. The court also found that traditional concepts of the role of admiralty law were not involved because the events surrounding Tancredi's death did not create any potentially disruptive impact on maritime commerce that was substantially related to traditional maritime activity. *Id.* at 784–85.

Defendant argues that *Tancredi* was wrongly decided and that this Court should instead follow the Third Circuit's decision in *Sinclair v. Soniform* and uphold jurisdiction over this action. *See Sinclair v. Soniform,* 935 F.2d 599, 602–03 (3rd Cir.1991) (court had jurisdiction over claims against crew of commercial vessel that transported diver to and from dive site). Like *Tancredi, Sinclair* arose out of injuries obtained during a commercial diving expedition off of a boat in navigable waters. The plaintiff in *Sinclair,* however, did not allege that the defendants were negligent in training him or supervising his dive activities. Rather, he alleged that the boat crew transporting him to and from the dive site failed to detect the symptoms of his decompression sickness and to administer treatment promptly. *Sinclair* 935 F.2d at 602. The *Sinclair* court characterized the general activity involved as the "traditional maritime activity of transporting passengers for compensation," thus finding a sufficient nexus between the crew's tortious actions and maritime activity to support admiralty jurisdiction. *Id.* The court reasoned that the instrumentality involved in the incident was the maritime vessel and that the crew's alleged failure to promptly treat the plaintiff related to their duty to provide adequate care to passengers. This duty is an integral part of the maritime activity of transporting passengers. Moreover, creating a uniform duty of care owed to passengers is a traditional goal of admiralty law. *Id.* at 603.

The *Sinclair* court also found that the activity of the crew affected maritime commerce both actually and potentially. *Id.* at 602. The actual impact arose from the fact that the vessel itself was engaged in a com-

---

2. The appellate court did not specifically address the first step of the *Sisson* test. However, the district court found that a diving accident on

navigable waters, requiring emergency rescue operations, was of the type likely to disrupt commercial activity. *Delta,* 986 F.2d at 1260.

mercial venture. The potential impact arose from the emergency nature of the incident: had the crew been aware of Sinclair's need for immediate medical assistance, they may have signaled to other vessels in the area. Other commercial vessels, responding to such a distress signal, would have been diverted from their normal commercial ventures.

In the case at bar, the Court finds the first prong of the *Sisson* test clearly established. As in *Delta* and *Sinclair* the emergency nature of Licata's accident created a potential disruption of maritime commerce. Indeed, the Body Glove crew attempted to contact a faster boat to transport Licata and another boat was summoned to pick up the divers left behind when the Body Glove took Licata to shore.

The more difficult question is whether the activity giving rise to the incident bears a substantial relationship to traditional maritime activity. The difficulty arises because of the mixed activities involved in this case. On the one hand, the Licatas participated in the boat excursion as paying customers. Any actionable injuries received while on the boat would clearly be subject to admiralty jurisdiction. This is true even if the injuries occurred during such non-maritime activities as eating or dancing. If Philip Licata was injured while embarking or disembarking from the boat, any action would likewise be subject to admiralty jurisdiction. Indeed, if Philip Licata had cut his leg on the boat's ladder while entering the water for his dive excursion, it would be actionable in admiralty jurisdiction. Moreover, if the crew failed to administer proper first aid to any of these hypothetical injuries, such failure would be actionable under admiralty law.[3] Application of the *Delta* test would be identical for each of these illustrations. Philip Licata would be viewed as a commercial passenger; Limitation Plaintiff, a common carrier. The instrumentality involved in the injury would be the boat; the nature of the injury, an accident on a boat. The traditional admiralty concept involved in each case would be the need for a

uniform duty of care to passengers on commercial boats. Clearly, these factors establish that the relevant activity for each of these accidents would be the traditional maritime activity of transporting passengers.

Philip Licata, however, was not injured on a boat. He was injured while engaging in the highly technical and potentially dangerous sport of scuba diving. His relationship to Johnson and Kanoa at the time of the accident was not that of passenger to common carrier; it was student to instructor, diver to dive master. The instrumentality involved was a self contained underwater breathing apparatus, not a boat. His injuries were not of the type typically resulting from negligent care of passengers on a boat excursion. Rather, they were injuries unique to scuba diving, resulting from the adverse effects of pressure on gases in the body. Comparing these factors with those outlined above clearly demonstrates that the relevant activity was not the boat's transportation of Licata to the dive site. Rather, Philip Licata's accident arose directly from the activity of recreational scuba diving. Likewise, Kanoa's potential liability is not based on its care of Licata during transportation on the Body Glove. Limitation Claimant's liability, if any, arose from the manner in which it conducted its dive expedition.

Any relationship between the accidental death of Philip Licata and the boat's transport of him to the dive site was "wholly fortuitous and completely unrelated to the tort itself." Many dive expeditions are conducted directly off of Hawaii's beaches. Still others are conducted by independent dive masters or dive instructors off of commercial vessels having no connection to the dive coordinators. That Licata was briefed for the dive on the boat was likewise fortuitous. *Cf. Duplechin v. Professional Association for Diving Instructors*, 666 F.Supp. 84, 87–88 (E.D.La.1987) (court did not have admiralty jurisdiction over claims against a dive shop for improperly instructing a diver where dive

---

**3.** Likewise, any claims against the crew for failure to adequately respond to Licata's emergency would be actionable under admiralty jurisdiction. The registered nurse on board the Body Glove, however, indicated that Licata was not breathing and that she could not find a pulse when he was brought aboard the boat. Thus, it is unlikely that any such claims could be raised against the crew.

746

shop instructed and certified diver three years prior to the dive accident). Any relationship between the activity of recreational diving from which the accident arose and the maritime activity of transporting Licata to the dive site is thus insufficient to support admiralty jurisdiction. Rather, the Court finds that this is a case which can and should be determined under state tort law standards. Therefore, the Court grants Claimant's motion to dismiss for lack of subject matter jurisdiction.

By Order dated March 28, 1994, this Court stayed suit against Kanoa outside of this action. Because this case is hereby dismissed for lack of jurisdiction, that order is canceled.

### CONCLUSION

For the foregoing reasons, this Court GRANTS Claimant's motion to Dismiss.

IT IS SO ORDERED.