25 P.3d 826

**Reynaldo FORONDA, as Special Administrator for the ESTATE OF Jeffrey Arciaga FORONDA, Reynaldo Foronda, and Candida Foronda, Plaintiffs–Appellants,**

v.

**HAWAII INTERNATIONAL BOXING CLUB, County of Hawaii, Defendants–Appellees.**

No. 21703.

Intermediate Court of Appeals of Hawai'i.

May 24, 2001.

Certiorari Denied July 2, 2001.

Michael B. Dabney, Deputy Corporation Counsel, on the briefs, for defendant-appellee County of Hawaii.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by LIM, J.

On September 14, 1923, in New York City, the fabled heavyweight boxing champion Jack Dempsey defended his title against Luis "Angel" Firpo, who outweighed him by well over twenty pounds. Dempsey, a veritable hatchet, chopped his man down in the second round, but not before the ursine Firpo knocked him through the ropes and out of the ring. Boxing lore has it that ringside reporters helped Dempsey back into the ring, enabling him to complete the tale that has borne countless repetitions.[1]

On March 30, 1995, young amateur boxer Jeffrey Foronda (Foronda) was hit in the stomach while sparring at the Waiakea Recreation Center. Doubled over, Foronda sat on a ring rope to catch his breath, but then slipped down backward between the ropes and hit his head, losing consciousness. He never regained his senses and died three days later.

Foronda's parents, Plaintiffs–Appellants Reynaldo and Candida Foronda (Plaintiffs), commenced this action in the circuit court of the third circuit against Defendants Hawai'i International Boxing Club (HIBC), Foronda's amateur boxing club, and the County of Hawai'i (County), the owner and operator of the Waiakea Recreation Center boxing ring, alleging that the Defendants had negligently constructed, maintained and supervised the Waiakea Recreation Center boxing ring, causing the death of their son.

Circuit court judge Riki May Amano granted motions for summary judgment in favor of both HIBC and the County based upon the doctrine of assumption of risk. The court also found that "[t]he County of Hawaii had no knowledge or notice of any condition of its boxing ring posing an unreasonable risk of harm."

Phillip L. Carey, (Ahmadia & Carey), on the briefs, Hilo, for plaintiffs-appellants.

Sidney K. Ayabe and J. Thomas Weber, on the briefs, Honolulu, for defendant-appellee Hawaii International Boxing Club.

1. *See* Alex Hall, *Jack Dempsey: Society's Most Adored. And Boxing History's Biggest Fraud?,* The Cyber Boxing Zone, February 2000, at www.cyberboxingzone.com.

Plaintiffs appeal the court's June 10, 1998 judgment, the underlying findings of fact, conclusions of law and order granting the motions for summary judgment, and the order denying their motion for reconsideration.

Plaintiffs present two issues on appeal. They argue, first, that the court granted summary judgment in favor of both HIBC and the County based upon the erroneous conclusion that Foronda assumed all risks that contributed to his death. They also contend the court granted the County summary judgment based upon the erroneous finding that the County had no knowledge of any dangerous condition of the ring.

We hold, as a matter of law under the doctrine of primary implied assumption of risk, that Foronda assumed all risks that contributed to his death. We therefore affirm the judgment.

## I. Background.

On March 30, 1995, the twenty-five-year-old Foronda, an amateur boxer, was sparring at the Waiakea Recreation Center under the supervision of his coach Walter F. Carvalho, Sr. (Carvalho) and his trainer John Lopez (Lopez). In order to prepare Foronda for an upcoming fight, Carvalho had wanted him to spar two rounds with Lopez, then two with fellow amateur Anthony Pagan (Pagan). Each round was to last three minutes, with a one-minute rest between rounds. Although Lopez was a professional boxer, Carvalho considered him a "novice" because Lopez had only "about eight or nine fights" under his belt.

After sparring with Lopez, Foronda told Carvalho that he was ready to box some more, so he proceeded to spar with Pagan. As Carvalho described it, "[Foronda] looked great because he came back to the corner in the second round [against Lopez] and he was ready to go another three if I wanted him to." Pagan, also twenty-five years old, was about twenty pounds lighter than Foronda. He was, according to Carvalho, "below [Foronda's] caliber." Although Pagan had been boxing about as long as Foronda and had one or two more amateur bouts under his belt than Foronda, Carvalho opined that Foronda was "way better than [Pagan] is."

Halfway through his first round of sparring, Pagan hit Foronda with a straight, right-hand punch to the stomach. Pagan remembered that the blow was not a hard punch, but that he caught Foronda in the right place. As soon as he got hit, Foronda stopped boxing and curled over for a bit, then stood up to stretch his stomach in order to catch his breath. He then backed up and sat on a rope of the ring, bent over with his head down.

The rope was the second highest of four ropes strung around the perimeter of the ring above the ring canvas. Unburdened, the second rope was 27 inches from the canvas. When Foronda sat on the second rope, it "sagged some under his weight[.]"

Carvalho said that after a boxer absorbs a body punch, he might lean or sit on the ropes to catch his breath, sometimes for thirty seconds or more, and in such instance it is normal practice to instruct the boxer to raise his hands to open his lungs. In this instance, Foronda appeared to have the wind knocked out of him, so Carvalho and Lopez instructed him in accordance with the normal practice. Foronda smiled and waved to acknowledge the instructions.

After sitting on the rope for about thirty seconds, Foronda leaned forward a little, then to the side, and finally slipped down backward between the second and third ropes. As he put out his hand as if to brace his fall, his rear end touched the floor; then his shoulders and next his head hit the thin carpet covering the floor outside the ring. Carvalho related that Foronda "went down real slow then barely hit his head." Carvalho said he was surprised at the turn of events because he had never seen anyone hurt in a similar manner. In contrast, Carvalho recalled:

I've seen [boxers] dive through [the ropes], guys push them through or he come running at the guy and the guy side-step him and he fly through.

I've seen them fall off [rings raised four feet off the floor], hit his head on the table, bang his head on the concrete and get up and walk out or get back in the ring and start fighting. I've seen that.

Never have I seen a [ring flush to the floor] like this that somebody sits down, lay down and goes into a seizure.

Carvalho added that nothing unusual occurred during the sparring before the accident.

Throughout the sparring session, Foronda wore protective head gear with extra-heavy padding, a protective cup and a fitted mouthpiece. For added safety, the boxers were using sixteen-ounce gloves, the largest gloves permitted. Despite the safety precautions, Foronda lost consciousness. He was taken to Hilo Hospital, then transferred to Straub Hospital, where he died three days later. The autopsy report found that Foronda died of a "severe intracranial injury, consistent with striking the head on a hard surface." The report also noted a "[s]mall area of bruising of the right diaphragm, anteriorly."

HIBC was a local, nonprofit, amateur boxing club formed by Carvalho. At the time of the accident, Carvalho had been a registered boxing coach and a certified boxing official for over thirty years, and was the president of HIBC. He was also a referee, judge and promoter.

HIBC was affiliated and registered with a national organization, United States Amateur Boxing, Inc. (USA Boxing). The 1993–1995 USA Boxing official rules provided that boxing rings, regardless of size, "shall be equipped with at least 4 ropes. All rings will have two spacer ties [connecting the ropes vertically] on each side of the ring to secure the ropes." The rules also required that the apron, or covering, of the ring floor extend beyond the ropes at least two feet. The rules set the maximum height of the ring floor at four feet off the ground. For international competitions, the ring floor had to be at least three feet, but not more than four feet, above the base. The rules were silent with respect to covering or padding for the ground or base surrounding and immediately below the ring. However, the rules applied only to boxing competitions and not to sparring or practice sessions. In any event, not all amateur boxing clubs on the island were registered with USA Boxing and not all amateur boxers on the island belonged to a club.

The County of Hawai'i owned, maintained and operated the Waiakea boxing ring. At the time of the accident, the ring was being used by at least two other boxing clubs on the island. HIBC used the facility with permission from the County, based upon a written "Application for Use of Facilities." Use of the facility was free of charge, except for a two-dollars-per-hour fee on the weekends. Between 1992 and the date of the accident, nobody had complained to Carvalho or to the County about the condition of the ring. Nor were there any injuries reported resulting from sparring or ring conditions.

Unlike boxing rings used for competition, that are raised up off the floor, the Waiakea ring was mounted flush with the gym floor. Measured from the inside of the ropes, the ring was an eighteen-foot ring, with a two-foot apron outside the ropes, and a thin, padded carpet covering the concrete outside the apron. The boxers used the carpet to wipe grime off their feet before entering the ring.

In 1992, when Carvalho first signed up to use the Waiakea ring, he was concerned with its condition. He approached the County to inquire about improving the facilities. Carvalho had built rings in the past, and considered himself pretty knowledgeable about such matters. He obtained permission from the County to replace the canvas and install new ropes and turnbuckles. Even though padding was required only for competitions, Carvalho added padding to the ropes and turnbuckles to keep anyone from getting hurt. The County provided the materials for the renovation, but Carvalho improved the ring based solely upon his expertise, with no instructions from the County. Asked why he undertook to renovate the Waiakea boxing ring, Carvalho responded:

Because I'm a self-starter. If I believe that the facilities need to be repaired, I'll go ahead and ask for it. If I don't get it repaired, I do it. You give me the material I'll have it done, especially if it pertains to the safety of my boxers.

And I do it anywhere I would be working out with my boxers.

In his renovation of the ring, Carvalho installed only one spacer tie on each side of

the ring. The use of one spacer tie per side was considered the "old style" of making rings. Under this regime, one tie per side was sufficient for sixteen and eighteen-foot competition rings. Rings that measured twenty, twenty-two or twenty-four feet in diameter required two ties per side. It was Carvalho's belief that the two-tie rule for all rings came out in 1993, but he asserted that the USA Boxing rules did not apply to practice facilities such as the Waiakea ring. Furthermore, he had not been aware of the two-tie rule for eighteen-foot competition rings until after the accident.

Carvalho attached the spacer ties to the ropes by looping the tie around each rope once or twice, then taping the loops. Carvalho was aware of a new type of spacer tie available on the market, that utilized small strips to tie the spacer to the rope.

Foronda boxed with HIBC from May 1992 to April 1993, then from February 1995 until his accident on March 30, 1995. He had two amateur fights during the former period, with a won-lost record of 1–1. In the one win, he knocked his opponent out. In the one loss, he was knocked out.

During the course of his participation, Foronda signed three releases and waivers of liability. On May 5, 1992, Foronda registered with HIBC and signed a release and waiver that included the following language:

> I hereby give my consent to my son (or ward) to participate. in training and competitive exercises and in consideration of your accepting my entry, I hereby, for myself, my heirs, executors and administrators, waive and release all rights and claims for damages I may incur against the Hawaii International Boxing & Kick Boxing Club, Inc., their representatives and assigns for any and all injuries suffered by my son (or ward) or myself at the place of training or any scheduled bouts or competitions.

On January 10, 1993, Foronda applied for membership with USA Boxing and signed another release and waiver, which read as follows:

> In consideration of permission granted me or my son/ward by the United States of America Amateur Boxing Federation Incorporated (USA/ABF Inc.), and [sic] Ohio, not-for-profit corporation ... to participate in amateur boxing, during my or his tenure as an amateur boxer, I hereby release and discharge the USA/ABF, Inc., Hawaii LBC ["local boxing club"; in this case, HIBC] agents, employees and officers, from all claims, demands, actions, judgments and executions which the undersigned's heirs, executors, administrators, or assigns may have, or claim to have, against USA/ABF, Inc., Hawaii LBC, its successors for all personal injuries, known or unknown, and injuries to property, real or personal, caused by, or arising out of, the above-described sports activities.
>
> I, the undersigned, fully understand that this sport activity has inherent risks involved, but fully waive rights, claims, cause of action, etc., as heretofore enumerated and do hereby assume the risk.
>
> I, the undersigned, have read this Release/Waiver and understand all its terms and conditions, I execute it voluntarily and with full knowledge of its significance.

Foronda signed a third release and waiver on March 14, 1995, when he renewed his membership with USA Boxing after taking an extended break from boxing:

> In consideration of membership granted me or my son/daughter by United States Amateur Boxing, Inc., (USA Boxing) to participate in amateur boxing during my or his/her tenure as an amateur boxer, I, the undersigned, waive and release any and all rights that I, my heirs, executors, administrators or assigns may have or claim to have for any claims, demands[,] actions, judgements [sic] and executions against USA Boxing, its LBCs, clubs[,] successors or assigns, for all personal injuries, known or unknown, and injuries to property, real or personal, caused by or arising out of the above described sports activities.
>
> **If I observe any unusual, significant rule violations or hazards during my presence or participation, I will remove myself from participation and bring such to the attention of the nearest official immediately.**

I, the undersigned, fully understand and appreciate that participation in sport carries a risk to me of serious injury, including permanent paralysis or death. I voluntarily and knowingly recognize, accept and assume this risk.

I, the undersigned, have read this Release/Waiver and understand all its terms and conditions, I execute it voluntarily and with full knowledge of its significance.

(Emphasis in the original.) It was Carvalho's practice to instruct each boxer to read the release and waiver before signing it and, if it was not understood, to let him know. Foronda never indicated a lack of understanding.

In opposition to the Defendants' motions for summary judgment, the Plaintiffs submitted, *inter alia*, the deposition testimony of Carvalho and Pagan, and that of another boxing coach and referee, Joseph Feliciano (Feliciano).

Carvalho explained that boxers do punch each other when they spar, "but not to take the other guy's head off." Sometimes they get "heated up" and it becomes necessary to caution a boxer or to pull him from the sparring session. Carvalho claimed that during the sparring in question, there was no need to warn either boxer to ease up, because they were not fighting that hard and were "working with each other."

When asked if the installation of two spacer ties per side would have made it less likely that Foronda would fall through the ropes, Carvalho speculated that two ties probably would have helped, but "I wouldn't say that it wouldn't have happened, not the way it happened." Carvalho continued, "The way he sat and fell, if you put all the ropes in the world it wouldn't have prevented him from falling down because that was very unusual what he did." Carvalho explained that if a boxer sits on the ropes like Foronda did, "[t]he ropes spread apart."

When asked if the requirements for sparring rings should be the same as those for competition rings, Carvalho opined that "we should use the best precautions that you can to prevent ... see, you don't want the boxer to get injured before he competes, so you

want to stay as much as you can toward keeping the guy from getting injured." He cautioned that this was his personal opinion only, because "some coaches have rings to work on, some don't to spar on. So I don't want to give an opinion as far as what everybody should do." As to whether Foronda had any knowledge of the difference between the Waiakea ring and a competition ring, Carvalho surmised that Foronda was probably unaware of any differences. But Carvalho maintained that Foronda was aware of the danger of falling out of the ring the way he did: "Sure. They go in and out of [the] ring twice, four times a night. They know that they could easily be thrown out or jump out or they could fall out if they lean back, or whatever. They know that."

Feliciano had been an active member of the local boxing community since 1987, as a boxer, coach, trainer, referee and judge. He maintained his expertise by regular attendance at seminars on safety rules and equipment for amateur boxing. Feliciano testified that spacer ties tighten the ring ropes to prevent sagging. The choice of one spacer tie versus two ties depends upon the tightness of the ring ropes and the type of fighting that goes on within the ropes. Like Carvalho, Feliciano had been unaware of the two-tie requirement until 1995.

Feliciano agreed that when a boxer leans on the ropes, there is always a possibility that the boxer will fall out of the ring. He had seen fighters fall backward through the ropes, even in rings with two spacer ties installed on each side. He professed no knowledge about the tightness of the ropes at the Waiakea ring. He said that some amateur boxing clubs do not even have a ring.

Feliciano stated that because the USA Boxing rules require two spacer ties for competition rings, a coach would want his boxer to get used to a ring that has two ties per side. Feliciano noted, however, that the rules for competition rings do not apply to sparring or practice. Indeed, he was unaware of any USA Boxing rules that applied to practice sessions, or required that sparring occur in a ring or in any particular type of ring. He remembered that when he used

to train, there was no ring, just a gym and lines on the floor delineating the perimeter of an imaginary boxing ring.

In response to questions regarding Carvalho's coaching ability, Feliciano opined that Carvalho was a good coach and very knowledgeable. His only criticism was, that when he sparred with one of Carvalho's boxers in 1993 or 1994, he felt that Carvalho didn't control his fighter.

Pagan testified that he also belonged to HIBC and that he usually sparred twice a week with the club. Before the accident, he had sparred "[p]lenty of times" with Foronda. He confirmed that it is more difficult to get in and out of the ring during competition because the two spacer ties make the ropes "tighter." Pagan felt, however, that the two-tie rule was not necessary for the Waiakea ring, because the ring was used only for sparring: "Because it's not like a real fight where they are going to be banging each other and moving hard against the ropes and stuff. It's supposed to be a sparring ring and not a fighting ring." When asked by Plaintiffs' counsel to acknowledge that, on occasion, boxers are "banged" during sparring matches, Pagan responded, "Yes." Plaintiffs' counsel then asked, "And that happened in your match with Mr. Foronda?" Pagan answered, "Yes."

## II. Standards of Review.

■ We review the circuit court's award of summary judgment under the same standard applied by the circuit court. *Amfac, Inc. v. Waikiki Beachcomber Investment Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22 (1992) (citation omitted).

■ Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (1999). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Huls-*

*man v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted). "In ruling on a motion for summary judgment, the alleged facts and the inferences logically drawn therefrom must be viewed in the light most favorable to the non-moving party." *Miller v. Manuel*, 9 Haw. App. 56, 65, 828 P.2d 286, 292 (1991) (citation omitted).

■ "The movant in a summary judgment proceeding has the burden of showing the absence of any material fact issue, and the movant may discharge that burden by showing that if the case went to trial there would be no evidence to support the non-movant's position." *Wagatsuma v. Patch*, 10 Haw. App. 547, 561, 879 P.2d 572, 581–82 (1994) (citations omitted). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." HRCP Rule 56(e) (1999).

## III. Discussion.

In *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1, 837 P.2d 1273 (1992), the Hawai'i Supreme Court encountered the nebula of the defense of assumption of risk:

The doctrine of assumption of risk has been a subject of much controversy and confusion, in large part because it encompasses, under the deceptively simple construct that a plaintiff has deliberately subjected himself to danger, the concepts of plaintiff's consent, defendant's lack of duty, and plaintiff's contributory negligence. J. Wade, *The Place of Assumption of Risk in the Law of Negligence*, 22 La. L.Rev. 5, 14 (1961); *see generally* F. James, *Assumption of Risk*, 61 Yale L.J. 141 (1952); [W.] Keeton, [Prosser and Keeton on Torts] § 68, at 480 [(5th ed.1984)]. The defense is not a favored one and the trend in the law has been toward abolishing it. *Blackburn* [*v. Dorta*], 348 So.2d [287,] 289 [(Fla.1977)]; 4 F. Harper, F. James, & O. Gray, The

Law of Torts § 21.0 n. 4, at 190 (2d ed.1986); *see generally* H. Woods, Comparative Fault § 6, at 131–163, 499–788 (2d ed.1987). The doctrine has been criticized as duplicative of more widely understood concepts such as duty and as adding "nothing to modern law except confusion," James, *supra*, at 169; Wade, *Assumption of Risk*, *supra*, at 14; Harper, James & Gray, *supra*, § 21.0, at 193 (describing "The Battle of the Wilderness," the name by which drafters of Restatement (Second) of Torts designated debate over whether to include the defense).

*Id.* at 34–35, 837 P.2d at 1290 (typesetting in the original, footnote omitted).

■ From the amalgam, the supreme court distilled two distinct doctrines. Assumption of risk is generally categorized as either express, in the sense of an express contract to relieve the defendant of certain duties, or implied, where relief from liability is implied from the plaintiff's act of electing to participate in the underlying activity despite known or reasonably foreseeable risk. With respect to the former category, the supreme court confirmed that

[a]ssumption of risk may be express, in the sense of an express contract. See *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781 (Colo.1989) (express release waiving any claim as a result of physical injury incurred while horseback riding); *Tunkl v. Regents of Univ. of Cal.*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 (1963) (hospital patient's express agreement to assume risks of medical negligence invalid as contrary to public policy); *Schneider v. Revici*, 817 F.2d 987 (2d Cir.1987) (statute recognizing "covenant not to sue").

*Id.* at 35, 837 P.2d at 1290 (typesetting in the original). With respect to the latter category, the supreme court recognized that yet another doctrinal divide exists within the concept of implied assumption of risk, between primary implied assumption of risk and secondary implied assumption of risk:

Implied assumption of risk has been used in the context of negligence cases to describe two distinct theories under which a defendant may avoid liability. The "primary" sense of implied assumption of risk emerged, along with the global doctrine itself, out of the common law action of a servant against his master. Keeton, *supra*, § 68 n. 1, at 480. Used in its primary sense, assumption of risk describes the act of a plaintiff, who has entered voluntarily and reasonably into some relation with a defendant, which plaintiff knows to involve the risk. It is an alternate expression of the proposition that a defendant owes no duty to a plaintiff. Restatement (Second) of Torts § 496A comment c; *Meistrich v. Casino Arena Attractions, Inc.*, 31 N.J. 44, 48, 155 A.2d 90, 93 (1959). Primary implied assumption of risk may be illustrated by the case in which a plaintiff has been injured as a natural incident of engaging in a contact sport. It may also be seen in the act of a spectator entering a baseball park, thereby consenting that the players proceed without taking precautions to protect her from being hit by the ball. Restatement (Second) of Torts § 496A comment c; *Ordway v. Superior Court*, 198 Cal.App.3d 98, 243 Cal.Rptr. 536 (1988).

In its "secondary" sense, implied assumption of risk focuses on a plaintiff's conduct, and describes a situation where plaintiff knows of the danger presented by a defendant's negligence and proceeds voluntarily and unreasonably to encounter it. *Meistrich*, 31 N.J. at 53, 155 A.2d at 93–94; Restatement (Second) of Torts § 496A comment c. A plaintiff's assumption of risk is unreasonable, and a form of contributory negligence, where the known risk of harm is great relative to the utility of plaintiff's conduct. Restatement (Second) of Torts § 496A comment c.

*Id.* at 35–36, 837 P.2d at 1290–91 (typesetting in the original, footnote omitted).

In *Larsen*, the question was, whether the various forms of assumption of risk survived the advent of comparative negligence in products liability cases. *Id.* at 34, 837 P.2d at 1290. The supreme court concluded that express assumption of risk survived, but that implied assumption of risk did not. With respect to the latter holding, the supreme court first concluded that the application of primary implied assumption of risk is absurd

in the context of "implied warranty and strict products liability tort actions":

> The concept of reasonable primary implied assumption of risk makes sense in the products liability context under one set of circumstances—where plaintiff is injured while reasonably using a product that is *not defective*, e.g., plaintiff has reasonably assumed the risk of being cut while using an ordinary knife. However, as applied to a *defective* product, the concept is absurd; if a plaintiff is injured while reasonably using a defective product, a defendant should not be relieved of liability. Indeed, a defective product is one that causes injury when it is used in a reasonable manner, and the tort and implied warranty doctrines of products liability were designed to compensate plaintiffs for these very injuries. We therefore decline to retain the concept of reasonable primary implied assumption of risk where it unnecessarily duplicates the "defect" analysis and has the clear potential to generate confusion and error.

*Id.* at 38, 837 P.2d at 1292 (emphases in the original). The supreme court then concluded that secondary implied assumption of risk, or what it termed "unreasonable primary implied assumption of risk," was subsumed in, and therefore merged with, the concept of comparative negligence:

> To the extent that there may be unreasonable primary implied assumption of risk, we find that the policy it represents—the notion that no duty is owed—has been rendered invalid by the merger of comparative negligence and implied assumption of risk. *See Armstrong* [*v. Cione,*], 69 Haw. [176,] 182, 738 P.2d [79,] 82–83 [(1987)]. We consequently hold that in implied warranty and strict products liability tort actions, the concept of primary implied assumption of risk is abolished, and implied assumption of risk provides a defense to liability only when plaintiff's "assumption of risk" is a form of contributory negligence. *Cf.* Restatement (Second) of Torts, *supra,* § 402A comment n at 356 (contributory negligence).

*Id.* at 38–39, 837 P.2d at 1292 (typesetting in the original).

It is clear from the supreme court's cabined rationale and holding in *Larsen* that it eliminated primary implied assumption of risk as a discrete defense only in the products liability context. Its reference to primary implied assumption of risk in the sports context indicates that the doctrine retains its essential vitality there. *Larsen* expressly noted its reliance on *Meistrich,* 31 N.J. 44, 155 A.2d 90 (1959), in its discussion of primary implied assumption of risk. *Larsen,* 74 Haw. at 35 n. 10, 837 P.2d at 1291 n. 10. *Meistrich* was a case in which an ice skater injured in a fall at a skating rink sued the operator of the rink. Thus, it involved the sports context in much the same issue the Hawai'i Supreme Court in *Larsen* confronted; namely, whether implied assumption of risk merged with the complete defense of contributory negligence then regnant in New Jersey. The Supreme Court of New Jersey answered in the affirmative with respect to secondary implied assumption of risk, but expressly preserved primary implied assumption of risk as a discrete and complete defense in the sports context. *Meistrich,* 155 A.2d at 96–97.

Shortly after *Larsen* was decided, the United States district court for the district of Hawai'i, in *Tancredi v. Dive Makai Charters,* 823 F.Supp. 778 (D.Hawai'i 1993), *overruling on other grounds recognized by, McClenahan v. Paradise Cruises, Ltd.,* 888 F.Supp. 120 (D.Hawai'i 1995), a diving fatality case, discussed *Larsen* and concluded that "[t]he Hawaii Supreme Court has not yet addressed implied assumption of risk, either secondary or primary, in the context of recreational sports." *Id.* at 788 (footnote omitted). Because it was sitting in diversity, the federal court exercised its "best judgment in predicting" that "the Hawaii Supreme Court would allow the defense [of primary implied assumption of risk] in an appropriate sports-related case." *Id.* (citation and internal quotation marks omitted).

In making its prediction, the *Tancredi* court reasoned that primary implied assumption of risk contemplates a plaintiff who reasonably chooses to bear a particular risk of harm. Conversely, the defendant owes no legal duty to protect the plaintiff

from any harm that risk may entail. There being no legal duty to breach, there can be no talk of negligence, *Bidar v. Amfac, Inc.*, 66 Haw. 547, 551, 669 P.2d 154, 158 (1983) ("it is fundamental that a negligence action lies only where there is a duty owed by the defendant to the plaintiff" (citations omitted)), and thus, primary implied assumption of risk remains a discrete and complete defense quite apart from comparative negligence. As stated by the *Tancredi* court,

> [a]ssumption of the risk acts as a complete bar where plaintiff's conduct in assuming a particular risk was reasonable (for instance, where a spectator chooses to attend a baseball game and as a consequence is injured by a stray ball). A successful pleading of assumption of the risk precludes a finding of breach of duty. *See* Comment Note—Distinction Between Assumption of Risk and contributory [sic] Negligence, 82 A.L.R.2d [1218] 1227, citing *Meistrich v. Casino Arena Attractions, Inc.*, 31 N.J. 44, 155 A.2d 90 (1959).

*Tancredi*, 823 F.Supp. at 788–89. On the other hand, secondary implied assumption of risk refers to a plaintiff's unreasonable decision to confront a risk of harm created by the defendant's negligence. The balancing of respective faults in those circumstances is quintessential comparative negligence and hence, subsumed therein, leaving no residue of independent existence for the defense of secondary implied assumption of risk:

> In secondary implied assumption of risk, the inquiry is whether or not plaintiff's conduct was unreasonable. It is a form of contributory negligence and the question is to what extent did Tancredi breach a duty of care for his own safety. In Hawaii, secondary implied assumption of risk is a form of comparative negligence to be compared against defendant's fault. "Where comparative negligence principles apply, assumption of risk that is a form of contributory negligence serves to reduce, rather than bar, plaintiff's recovery." *Larsen* 837 P.2d at 1290[sic], *citing Kaneko v. Hilo Coast Processing*, 65 Haw. 447, 463, 654 P.2d 343, 352 (1982); *Bulatao v. Kauai Motors, Ltd.*, 49 Haw. 1, 15, 406 P.2d 887, 895, *reh'g denied*, 49 Haw. 42, 408 P.2d 396 (1965). The trier of fact, in apportioning

the loss resulting from the injury, may consider the relative responsibilities of the parties.

*Id.* at 790.

■ The upshot of the rationale is, that if primary implied assumption of risk does not completely bar the plaintiff in any particular case, then general comparative negligence principles apply. And this was exactly the outcome in the *Tancredi* case. *Id.* at 788–90, *passim.* Be it acknowledged or *sub silentio*, this kind of conceptual triage is employed in the sports injury cases that follow.

■ We agree with the federal court's prediction and hold that primary implied assumption of risk remains a discrete and complete defense in sports injury cases. In its absence, general comparative negligence principles obtain.

In an oft-cited case which predated *Larsen* by a few years, *Turcotte v. Fell*, 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502 N.E.2d 964 (1986), the Court of Appeals of New York examined the defense of primary implied assumption of risk in the professional sports arena. The plaintiff, Ronald J. Turcotte, was a famous and well-journeyed professional jockey. He had ridden the incomparable Secretariat when that horse won the Triple Crown in 1973. Turcotte was seriously injured and rendered paraplegic when the horse he was riding clipped the heels of another, tripped and fell. He sued another jockey in the race, claiming that the other rider had caused the accident by negligently and in violation of New York Racing and Wagering Board rules crossing into Turcotte's lane of travel. Turcotte also sued the owner and operator of the Belmont Park racetrack, charging that uneven watering of the track had made it hazardously muddy. *Id.* at 966.

The New York court stated its understanding of the general doctrine of primary implied assumption of risk:

> The risk assumed has been defined a number of ways but in its most basic sense it means that the plaintiff, in advance, has given his consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known

risk arising from what the defendant is to do or leave undone. The situation is then the same as where the plaintiff consents to the infliction of what would otherwise be an intentional tort, except that the consent is to run the risk of unintended injury. The result is that the defendant is relieved of legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence.

*Id.* at 967–68 (citations and internal quotation marks omitted). The New York court identified primary implied assumption of risk as the category of assumption of risk implicated in sporting events:

> The doctrine has been divided into several categories but as the term applies to sporting events it involves what commentators call "primary" assumption of risk. Risks in this category are incidental to a relationship of free association between the defendant and the plaintiff in the sense that either party is perfectly free to engage in the activity or not as he wishes. Defendant's duty under such circumstances is a duty to exercise care to make the conditions as safe as they appear to be. If the risks of the activity are fully comprehended or perfectly obvious, plaintiff has consented to them and defendant has performed its duty. Plaintiff's "consent" is not constructive consent; it is actual consent implied from the act of the electing to participate in the activity. When thus analyzed and applied, assumption of risk is not an absolute defense but a measure of the defendant's duty of care and thus survives the enactment of the comparative fault statute.

*Id.* at 968 (citations omitted).

From these general principles, the New York court promulgated principles of application in the sports context that continue to resonate today.

First, and generally, the defense applies to "those injury-causing events which are known, apparent or reasonably foreseeable consequences of the participation[,]" except for "acts which are reckless or intentional." *Id.* (citations omitted). Clearly, a plaintiff's actual knowledge of risk does not circumscribe the defense.

Second, application of the defense differs with the defendant. With respect to coparticipant defendants, such as the jockey whom Turcotte had sued,

> [w]hether a professional athlete should be held under this standard to have consented to the act or omission of a coparticipant [sic] which caused his injury involves consideration of a variety of factors including but not limited to: the ultimate purpose of the game and the method or methods of winning it; the relationship of defendant's conduct to the game's ultimate purpose, especially his conduct with respect to rules and customs whose purpose is to enhance the safety of the participants; and the equipment or animals involved in the playing of the game. The question of whether the consent was an informed one includes consideration of the participant's knowledge and experience in the activity generally.

*Id.* at 969. On the other hand, nonparticipant defendants, such as the racetrack owner,

> owed the same general duty to those using its property as to owners of real property generally, the duty to exercise reasonable care under the circumstances. Reasonable care may vary, however, depending upon the party seeking relief and his purpose in being on the premises.
>
> . . . .
>
> [The racetrack owner's] duty to plaintiff is similarly measured by [plaintiff's] position and purpose for being on the track . . . and the risks he accepted by being there. In deciding whether plaintiff consented to the conditions which existed at the time, the court should consider the nature of professional horseracing and the facilities used for it, the playing conditions under which horseracing is carried out, the frequency of the track's use and the correlative ability of the owner to repair or refurbish the track, and the standards maintained by other similarly used facilities.

*Id.* at 970 (citations and internal quotation marks omitted).

Last, the policy underlying the defense is "the belief that the law should not place unreasonable burdens on the free and vigorous participation in sports[.]" *Id.* at 968 (citation and internal quotation marks omitted).

Applying the foregoing principles, the New York court decided that Turcotte's complaint should have been dismissed as to all defendants. *Id.* at 966–67. It is worth noting that in doing so, the court held that rules of the sport, even those relating to safety, are rules and consequences on their own terms which often address instances of mere carelessness, and while worthy of consideration in the application of the defense, do not supplant the governing principles it enunciated. *Id.* at 969–70.

*Turcotte* was employed soon enough, unfortunately, in *Classen v. Izquierdo,* 137 Misc.2d 489, 520 N.Y.S.2d 999 (N.Y.Sup.Ct. 1987). During the course of a professional middleweight bout at Madison Square Garden, Willie Classen sustained a number of blows to the head. He was knocked out in the tenth round and died five days later as a result of a subdural hematoma. His widow sued, naming a number of defendants, but not including Classen's opponent. *Id.* at 1000.

In ruling on motions for summary judgment brought by several defendants, the *Classen* court summarized the holdings in *Turcotte:*

> In *Turcotte v. Fell, supra,* the Court of Appeals granted summary judgment to a racetrack proprietor and co-participant on the ground that a professional athlete who elects to engage in a sport assumes all risks which are inherent in that sport and thus any injuries that are reasonably foreseeable as a consequence of participation. The exception to this rule includes those injuries caused by intentional or reckless acts. Whether a risk is inherent in a particular sport depends on various factors including the nature of the sport and the foreseeability of the danger based on the athlete's prior experience.

*Id.* at 1000–01 (typesetting in the original). A movant of note was the Garden, promoter of the fight and operator of the premises, alleged to have provided "faulty emergency equipment." The court granted summary judgment in favor of the Garden, holding that "[t]he risk to a seasoned professional boxer of improperly maintained or faulty emergency equipment is . . . reasonably foreseeable under the circumstances and, thus, Madison Square Garden's only duty was to avoid reckless or intentional acts." *Id.* at 1001.

*Turcotte* was again the touchstone case in *Benitez v. New York City Bd. of Educ.,* 73 N.Y.2d 650, 543 N.Y.S.2d 29, 541 N.E.2d 29 (1989). Benitez, a high school senior, broke his neck during a varsity football game while correctly executing a block on a kickoff return. He sued the City board of education and its athletic league, claiming, among other things, that they were negligent in allowing him to play without adequate rest. His coach and an assistant principal had warned the school's principal "that the game was a mismatch and should not be played because of the high risk of injury." A star athlete, Benitez participated, as was his wont, in the "great majority of plays" on offense, defense and special teams. Benitez felt fatigued at the time of his injury, but did not tell his coach about his condition. *Id.* at 30–31.

Rejecting Benitez' argument that the defendants owed him an *in loco parentis* duty of care, the Court of Appeals of New York held that

> [f]atigue and, unfortunately, injury are inherent in team competitive sports, especially football. . . . Within the breadth and scope of his consent and participation, plaintiff put himself at risk in the circumstances of this case for the injuries he ultimately suffered. On his own proof, he thus failed to meet the burden of showing some negligent act or inaction, referenced to the applicable duty of care owed to him by these defendants which may be said to constitute a substantial cause of the events which produced the injury. The injury in this case, in sum, was a luckless accident arising from the vigorous voluntary participation in competitive interscholastic athletics.

*Id.* at 34 (citations and internal quotation marks omitted). Apparently, the *Turcotte* doctrine does not parse overmuch with respect to age and experience, or as between professional and amateur athletics.

In a more recent boxing injury case out of New York, *DiMarco v. New York City Health and Hospitals Corp.*, 187 A.D.2d 479, 589 N.Y.S.2d 580 (1992), City firefighter Frank DiMarco was seriously injured while boxing at a private gym. He and his wife instituted a negligence action against the gym owner. *Id.* at 581.

Without detailing in its opinion the nature of the alleged negligence, the supreme court appellate division, citing *Turcotte*, affirmed the supreme court's dismissal of the lawsuit, holding that

> the injured plaintiff was a skilled and experienced boxer who voluntarily participated in the boxing event which led to his injuries. Under the doctrine of assumption of risk, the injured plaintiff, by such participation, consented that the duty of care owed him by the gym was no more than a duty to avoid reckless or intentionally harmful conduct. Since there is no claim that the gym's conduct towards the injured plaintiff was reckless or intentionally harmful, nor is there any support in the record for such a claim, it is axiomatic that the gym did not breach any duty of care to the injured plaintiff. Without a breach of any duty, the gym cannot be found to have had a part in causing or augmenting the injury[.]

*Id.* at 581–82 (citations omitted). From what we can glean from the opinion, *passim*, it appears that DiMarco was boxing as an amateur at the time of his injury.

As was the case with *Larsen* in the products liability context, *Turcotte*'s reexamination of the defense of primary implied assumption of risk in the sports context was actuated by the rise of comparative negligence and the corresponding demise of the complete defense of contributory negligence. *Turcotte*, 510 N.Y.S.2d at 52, 502 N.E.2d 964. On the other coast, in California, the advent of comparative negligence led in similar fashion to a new look at primary implied assumption of risk in the sports arena. In *Knight v.*

*Jewett*, 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696 (1992), the Supreme Court of California had occasion to do its own reexamination of the defense, in a case in which the plaintiff claimed she was injured by the overly rambunctious play of the defendant in a pickup touch football game.

The California court decided, like the New York court in *Turcotte*, that the discrete and complete defense of primary implied assumption of risk survived the hegemony of comparative negligence, while the secondary sense of it merged. *Knight*, 11 Cal.Rptr.2d 2, 834 P.2d at 703. The *Knight* court then went on to limn outlines of the defense in the sports context that essentially trace those promulgated in *Turcotte*.

First, and generally, defendants have no duty to protect a plaintiff against risks of harm that are inherent in the sport; correlatively, defendants do have a duty of due care not to increase such risks:

> As a general rule, persons have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures another person. . . . In the sports setting, however, conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself.
>
> . . . .
>
> Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risk inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport.

*Id.* at 708 (citations omitted).

Second, the emphasis upon the risk *inherent* in the sport suggests that a plaintiff's subjective knowledge or appreciation of the potential risk is not the exclusive, or even primary, focus in defining a defendant's duty. Rather, application of the defense differs from sport to sport and from defendant to defendant. The *Knight* court observed that

> [r]ather than being dependent on the knowledge or consent of the particular plaintiff, resolution of the question of the defendant's liability in such cases turns on

whether the defendant had a legal duty to avoid such conduct or to protect the plaintiff against a particular risk of harm. As already noted, the nature of a defendant's duty in the sports context depends heavily on the nature of the sport itself. Additionally, the scope of the legal duty owed by a defendant frequently will also depend on the defendant's role in, or relationship to, the sport.

*Id.* at 709. Because *Knight* involved a co-participant defendant and no others, the court had occasion to consider closely only the standard of conduct applicable to co-participant defendants. After an exhaustive review of the pertinent cases, the court held that

> a participant in an active sport breaches a legal duty of care to other participants— i.e., engages in conduct that properly may subject him or her to financial liability— only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport.

*Id.* at 711 (footnote omitted).

Finally, and again in the co-participant context, the *Knight* court enunciated the policy sustaining the defense—the preservation of free and vigorous participation in sports:

> In reaching the conclusion that a coparticipant's [sic] duty of care should be limited in this fashion, the cases have explained that, in the heat of an active sporting event like baseball or football, a participant's normal energetic conduct often includes accidentally careless behavior. The courts have concluded that vigorous participation in such sporting events likely would be chilled if legal liability were to be imposed on a participant on the basis of his or her ordinary careless conduct.

*Id.* at 710. Accordingly, the court put the rules of the game in their proper place vis-á-vis the defense:

> The cases have recognized that, in such a sport, even when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of *legal liability* for such conduct might well

alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule.

*Id.* (emphasis in the original).

Having said all that, the *Knight* court held that the defendant had been, "at most, careless or negligent in knocking over plaintiff, stepping on her hand, and injuring her finger." *Id.* at 712. Primary implied assumption of risk thus constituted a complete defense, and there was no need to go further to consider comparative negligence. *Id.*

Several years after *Knight,* the California court of appeals had occasion to flesh out the theory of primary implied assumption of risk in *Bushnell v. Japanese–American Religious and Cultural Ctr., Concord Judo Club,* 43 Cal.App.4th 525, 50 Cal.Rptr.2d 671 (1996). Bushnell had been practicing a judo throw with an instructor at a judo club, performing each repetition at an increased speed. On the last of many repetitions, Bushnell broke his leg. Claiming that the speed with which he was led through the maneuver was excessive, Bushnell sued the judo club, claiming that it was liable for the negligence of its instructors. *Id.* at 673.

Because the judo club was a defendant, the *Bushnell* court had the opportunity to revisit *Knight,* as it might apply to defendants other than co-participants in the sport. In doing so, the court enunciated a general rule applicable in all cases and to all defendants:

> [I]n all cases the nature of the activity, the relationship of the defendant to the activity and the relationship of the defendant to the plaintiff must be examined. It must then be determined, in light of the activity and these relationships, whether the defendant's conduct at issue is an "inherent risk" of the activity such that liability does not attach as a matter of law. General rules of liability attach when the defendant's conduct is not an inherent risk of the activity or when the defendant's conduct increased the inherent risks in the activity. A defendant also may be charged with the duty to take such precautions as

will prevent the risk without having a chilling effect on the nature of the activity. *Id.* at 674. Thereupon, the *Bushnell* court held that repetitive training at increasing speed is an inherent part of a sport such as judo. Imposing liability where an instructor endeavors to improve a student's skill would discourage such practice and thus have a pernicious effect upon the sport as a whole. *Id.* at 675.

Armed with the foregoing precedents, examples and principles, we turn to the matter at hand.

From the circuit court's ruling in this case, we can discern that the summary judgments were granted based upon the doctrine of primary implied assumption of risk. The circuit court stated in conclusion of law number 4:

> [Foronda] assumed all risks inherent in the sport of boxing, including the risk of being struck during sparring, the risk of falling through the ropes of the boxing ring, the risk of falling, the risk of striking his head on the floor as a result of a fall during sparring practice, the risk of being improperly supervised, the risk of improper coaching, and all other risks which are alleged to have contributed to his untimely death.

Accordingly, we limit our remaining discussion to primary implied assumption of risk.[2]

 We hold that primary implied assumption of risk is a discrete and complete defense[3] where the defendant's conduct at issue is an inherent risk of the sports activity. In determining whether the defendant's conduct is an inherent risk of the sports activity, we consider the nature of the activity, the relationship of the defendant to the activity and the relationship of the defendant to the plaintiff. A defendant may be held liable to the plaintiff for creating or countenancing risks other than risks inherent in the sport, or for increasing inherent risks, and in any event will be held liable for recklessly or intentionally injurious conduct totally outside the range of ordinary activity involved in the sport, but liability should not place unreasonable burdens on the free and vigorous participation in the sport.

We first consider the unique nature of the sport of boxing. Whatever one's personal opinion of the sport might be, and we notice that the sport has many avid participants, fans and adherents, it must be acknowledged that society still tolerates the activity, in which participants excel by injuring their opponents. Indeed, the very acme of achievement for a boxer is to so batter the opponent as to induce a temporary coma—otherwise known as a knockout. We notice, further, that while not routine, it is not unheard of that permanent injury or even death results from the battering or the unwitting fall to the canvas. In any other context, such an activity would be unacceptable, indeed, criminal. *See, e.g.,* Hawai'i Revised Statutes § 707–712 (1993) ("[a] person commits the offense of assault in the third degree if the person ... intentionally, knowingly, or recklessly causes bodily injury to another person

---

2. In conclusion of law number 5, the circuit court stated that it did not base its summary judgments upon the doctrine of express assumption of risk:

> The three release and waivers Jeffrey Foronda executed do not expressly identify claims for "negligence" or the risk of "negligence" and this Order is not based on the validity of those agreements as releases, waivers, or contractual assumptions of risk, or their effect on claims for negligence.

Rather, the court accorded the three releases and waivers significance only as evidence in regards to primary implied assumption of risk. As the court stated in conclusion of law number 6:

> Jeffrey Foronda's execution of three release and waivers, which contained express language that he assumed the risk of bodily injury or death arising out of his participation in boxing, is evidence of his assumption of the risks associated with boxing.

3. We do not mean to suggest that primary implied assumption of risk is an *affirmative* defense to be proven by the defendant. As we have discussed, the doctrine "is an alternate expression for the proposition that defendant was not negligent[.]" *Meistrich v. Casino Arena Attractions, Inc.,* 31 N.J. 44, 155 A.2d 90, 93 (1959). Because "[a] plaintiff has the burden of proving negligence[,] ... [t]he burden of proof as to negligence of defendant does not shift to him merely because he chooses to express his denial of negligence in terms that plaintiff assumed (may not complain of) risks which inhered notwithstanding that defendant properly discharged the duty he owed in the circumstances." *Id.* at 97.

... [a]ssault in the third degree is a misdemeanor unless committed in a fight or scuffle entered into by mutual consent, in which case it is a petty misdemeanor").

The atavistic nature of the sport indicates that its inherent risks are extreme. The case law does not yield a significant, formal distinction between professional and amateur in this respect, *see, e.g., Benitez; DiMarco, supra,* and no wonder, for the analysis of primary implied assumption of risk looks to the nature of the activity, and whether it is paid or not is relevant only insofar as the distinction makes a difference in the plaintiff's skill and experience and in how the sport is performed. *See Classen,* 520 N.Y.S.2d at 1000-01 ("[w]hether a risk is inherent in a particular sport depends on various factors including the nature of the sport and the foreseeability of the danger based on the athlete's prior experience").

In this regard, Foronda was not a complete neophyte. He had boxed with HIBC from May 1992 to April 1993, then from February 1995 until the date of his accident on March 30, 1995. Over the course of his amateur boxing career, Foronda signed three written releases and waivers of liability, purporting to release HIBC from liability for death, injury and other risks inherent in the sport. He boxed competitively on two occasions, with a won-lost record of 1-1. On the former occasion, he knocked his opponent out; on the latter occasion, he was himself knocked out.

On appeal, all parties agree that a participant in the sport of amateur boxing assumes those risks that are inherent in the sport. Hence, Plaintiffs admit that Foronda assumed the risks of being hit hard in the stomach, suffering head injury from punches, hitting his head on the padded canvas, leaning against the ropes for some time without help from his coach or trainer, and falling backward through a properly built ring and thereby suffering injury.

Plaintiffs assert, however, that Foronda was unaware of, and did not assume, the dangers associated with sparring in a ring that lacked two spacer ties on each side and had, instead, single spacer ties that were looped around the ropes and taped rather than tied. These conditions, Plaintiffs contend, rendered the ropes looser and hence more hazardous:

> The ring was not only defective, but also deceptive. The ropes looked like they could save one from falling outside when one was incapacitated. But in fact what they actually did was acted [sic] as a trap, a tripping device, that tripped up [Foronda's] legs while allowing his upper body to fall.

The issue of the spacer ties is the most consistently salient issue Plaintiffs raise on appeal and relied upon below. From what we can tease out of their rambling appellate briefs and the record below, Plaintiffs also condemn the lack of padding on the floor outside the ring, presumably because that is where Foronda's head hit the floor. Plaintiffs also argue, sporadically, that Foronda was unaware of and did not assume the dangers associated with coaching or supervision that allowed him to spar with a professional boxer, that failed to control the intensity of the sparring, and that failed to assist him while he was sitting on the rope.

To the extent that these arguments, with their reference to Foronda's lack of awareness, seek to limit the defense of primary implied assumption of risk to those risks of which the particular plaintiff was subjectively aware, we reject them. What the particular plaintiff knew or did not know about the risks of the sport cannot be controlling. The very concept of inherent risk implies indwelling risk independent of the participant's subjective knowledge or perception of it. *See Classen,* 520 N.Y.S.2d at 1000 ("all risks which are inherent in that sport and thus any injuries that are reasonably foreseeable as a consequence of participation"). The inquiry is an objective one, and must be, for the vagaries of prior knowledge or perception of risk would undermine the doctrine's underlying policy, that "the law should not place unreasonable burdens on the free and vigorous participation in sports[.]" *Turcotte,* 510 N.Y.S.2d 49, 502 N.E.2d at 968. Indeed, on the edge of the sword opposite the one that cuts in favor of plaintiffs, lies the case of the risk subjectively

known in the particular case but not inherent in the sport. The focus in this regard is not on the particular participant's actual knowledge, but on the risks inherent in participation by one with the skill and experience of the plaintiff.

Plaintiffs' arguments, we apprehend, go instead to the concept of risk created or increased beyond the inherent. But from this perspective as well, Plaintiffs' arguments fail.

■ With respect to the issue of the spacer ties, we first acknowledge the obvious, that the ropes of a boxing ring are not a fail-safe net. The history we alluded to at the outset tends to confirm what Plaintiffs concede, that "[Foronda] certainly assumed the inherent risks of ... falling backward through a properly built ring (if that is possible) and thereby suffering injury." Plaintiffs' Memorandum in Opposition to Defendant County of Hawaii's Motion for Summary Judgment, at 21.

The evidence before the circuit court on the motions for summary judgment also confirms that the kind of injury Foronda suffered, and the instrumentality of that injury, are inherent risks of the sport. Carvalho testified in his deposition that boxers often sit or lean on the ropes, and can easily fall or be propelled through the ropes. During his thirty-year involvement with the sport, Carvalho had seen boxers dive through the ropes, get pushed through ropes and literally fly through the ropes. Plaintiffs' own witness, Feliciano, testified in his deposition that when boxers lean on the ropes, there is always the possibility of falling out of the ring. Indeed, Feliciano had seen fighters fall backward through the ropes, even from rings equipped with two spacer ties per side. Incidentally, we observe that Hawai'i Administrative Rules §§ 16–74–132 (professional boxing) and 16–74–393 (amateur boxing) (1993) contemplate, with complete equanimity, a boxer falling or being knocked out of the ring, and in fact provide rules for how and when the referee is to conduct the down count in those eventualities.

■ However, the question remains, in this particular case, whether Defendants created or increased a risk of the sport beyond the inherent by failing to utilize two spacer ties, properly tied, on each side of the boxing ring. This argument, based wholly upon a USA Boxing rules requirement, takes on the hue of a red herring when we remind ourselves that the accident happened while Foronda was sparring, or practicing for upcoming competition. The undisputed evidence before the circuit court indicated that the USA Boxing rules applied only to competition and rings used for competition, and not to sparring or practice.[4] Carvalho and Feliciano confirmed that the rules applied only to rings used in competition. Apart from the issue of the spacer ties, there is no evidence in the record that the Waiakea ring was otherwise unsafe or less than standard.

Indeed, it appears that in renovating and maintaining the ring as he did, Carvalho reduced rather than increased the risks inherent in the sport. The undisputed evidence before the circuit court showed that no specific standards existed for amateur sparring or practice sessions. Feliciano, an experienced boxer, coach, trainer and referee, who maintained his expertise by regular attendance at seminars on safety rules and equipment for amateur boxing, confirmed Carvalho's observation that some amateur boxing clubs do not even have a ring. He remembered that when he sparred, there was no ring. He sparred in a gym with lines on the floor representing the perimeter of an imaginary boxing ring. Hence, before Carvalho initiated the improvements to the ring, the risk of sustaining injury in a fall was clearly much higher than was the case in the ring renovated by Carvalho. Viewed in this light, the debate over spacer ties is akin to quibbling over the color of the seat belts installed in one's automobile.

Even assuming, *arguendo*, that the USA Boxing competition rules applied to the Waiakea boxing ring, we question whether they would have made for a generally safer

4. Hawai'i Administrative Rules (HAR) § 16–74–294 (1993) governs the general setup of professional boxing rings (there is no cognate rule for

amateur boxing rings), including the number and height of the ropes. There is, therein, no mention of spacer ties.

environment vis-á-vis the risk involved in this case. Remember that the rules contemplate an elevated ring, rather than a ring flush with the floor like the Waiakea boxing ring.[5] Where, as here, the risk of injury arose from the possibility of falling through the ropes, how much more precarious would a fully-compliant competition ring have been? In the same vein, but more to the heart of the matter, we wonder whether the tighter ropes wrought by double spacer ties, while lessening the risk of falling *through* the ropes, might nevertheless have increased the risks of falling *against* the ropes with, say, the throat or the back of the neck?

But all of this is mere speculation and surmise within the broad parameters of the obvious, inherent peril of falling or being propelled through the ropes of the boxing ring. We conclude that the use of single spacer ties on the Waiakea boxing ring, whether negligent or not, did not create a new risk or increase the inherent risk of sparring, and hence, cannot negate Foronda's assumption of the risk.

The same reasoning and the same conclusion apply to Plaintiffs' argument concerning the alleged lack of padding outside the ring. That argument pales in light of the risk inherent in the apparent practice of sparring on a gym floor without any ring at all. The argument becomes even more unsettled when we consider that the USA Boxing rules for competition did not even address the matter of covering for the floor outside and below the ring apron.[6] And we stress the word "below," as it again reminds us that, had the USA boxing rules been followed in this case, Foronda would have fallen *down* from a raised ring, as well as backward. It is, in any event, common knowledge that death in boxing can result from hitting one's head in a fall, however and wherever one happens to fall, and that such a fall can occur anytime and anywhere boxing of any kind takes place.

Again, we find ourselves parsing mere possibilities within the broad parameters of an obvious and inherent peril. We cannot say that the renovation or maintenance of the Waiakea ring increased inherent risk or created any new risk; instead, it appears that Carvalho's improvements had much the opposite overall effect. Imposing liability in this instance would have the perverse effect of penalizing Carvalho's voluntary safety improvements, however incomplete or imperfect, and raising the bar so high that the very participation of amateur boxers would be threatened, let alone the "free and vigorous participation" the law protects.

■ We now turn to Plaintiffs' arguments concerning defective coaching and supervision.

Plaintiffs criticize Carvalho's matching of Foronda with a professional boxer during the sparring session. However, the professional boxer was Lopez,[7] with whom Foronda sparred before his fatal round with Pagan. Pagan, on the other hand, was a fellow amateur boxer of comparable age and experience, with only about three or four fights on his resume. Pagan was twenty pounds lighter than Foronda and was considered by Carvalho to be "below [Foronda's] caliber." Foronda, Carvalho felt, was "way better than [Pagan] is." In the absence of allegation or evidence that the sparring session with Lopez somehow injured or debilitated Foronda, or otherwise contributed to the later accident, we cannot say that this concern is material.

As for Plaintiffs' contention that Carvalho failed to buffer the intensity of the fighting that went on during the sparring session, the only evidence before the circuit court about

---

5. HAR § 16–74–294, governing the general setup of professional boxing rings, provides that "[t]he boxing ring ... shall be elevated not more than four feet above floor."

6. HAR § 16–74–294, governing the general setup for professional boxing rings, has no provision for covering or otherwise padding the floor surrounding the ring. HAR § 16–74–295 (1993) provides that if a boxing ring is elevated at least three and one-half feet above the floor, "there shall be a clear space of three feet on all sides of the ring from the posts[,]" ostensibly in case a boxer falls out of the ring. But there is still no provision for a floor covering or other padding.

7. Although Lopez did box for money, Carvalho considered him a "novice" because Lopez had only "about eight or nine fights" under his belt at the time of the fatal accident.

that particular sparring session was that Foronda and Pagan were not fighting very hard, that they were "working with each other." The sole support for Plaintiff's contention is Feliciano's testimony that in 1993 or 1994, he sparred with one of Carvalho's boxers and felt that Carvalho did not control his fighter. Yet Feliciano, Plaintiffs' own witness, opined that Carvalho was a good coach and very knowledgeable. Feliciano was not, in any event, present during the fatal sparring session. Here again, we do not discern anything material or germane to the matter at hand.

Finally, Plaintiffs imply that Carvalho and Lopez negligently failed to assist Foronda while he was sitting on the rope. We fail to apprehend, however, how either of them could have divined that Foronda needed assistance, if indeed he did at that point. The only evidence before the court on this score was that Foronda was sitting on the rope trying to catch his breath, and that he acknowledged instructions about how to alleviate his condition with a wave of his hand. We remain unconvinced.

The hard reality is that in the sport of boxing, even the best of coaching and supervision cannot make the risk of falling and injuring oneself anything but inherent, as Plaintiffs admit it is. Nor can it preclude the risk that a boxer can be seriously injured, or killed, before his coach and trainer can do anything to prevent it; indeed, before they can even be aware that the fighter is in trouble. And it certainly cannot prevent two people who are hitting each other, even if only in practice, from becoming "heated up." As Pagan told Plaintiffs' counsel, on occasion sparring boxers "bang" each other. Pagan further admitted, that is what happened in this case. All of these risks are inherent in the sport. Said another way, Foronda assumed the risk that coaching and supervision cannot guarantee against injury while boxing. The coaching and supervision during the fatal accident did not, in any event, create a new risk or exacerbate an inherent risk.

Boxing is a savage sport, with inherent perils commensurate with its nature. Foronda's was a terrible accident, but well within the risk he assumed when he chose to participate in the sport. As long as society sees fit to tolerate this sport, such accidents will continue to occur, and short of editorializing or legislating, we can find no error in this case. Primary implied assumption of risk is a complete defense. Hence, we do not reach Plaintiffs' second point of error on the question of the County's knowledge of dangerous conditions.

## IV. Conclusion.

Accordingly, we affirm the circuit court's June 10, 1998 judgment.